982 So.2d 146 (2008)
STATE of Louisiana
v.
Donald L. DIXON.
No. 07-KA-915.
Court of Appeal of Louisiana, Fifth Circuit.
March 11, 2008.
*148 Paul D. Connick, Jr., District Attorney, Terry M. Boudreaux, Anne Wallis, Margaret Hay, Assistant District Attorneys *149 Twenty-Fourth Judicial District, Gretna, Louisiana, for Plaintiff/Appellee.
Holli Herrle-Castillo, Louisiana Appellate Project, Marrero, Louisiana, for Defendant/Appellant.
Panel composed of Judges THOMAS F. DALEY, MARION F. EDWARDS, and WALTER J. ROTHSCHILD.
THOMAS F. DALEY, Judge.
Defendant, Donald L. Dixon, was charged with one count of aggravated rape committed between August 1, 2003 and January 31, 2005, in violation of R.S. 14:42. He was found guilty as charged by a unanimous twelve-person jury on March 15, 2007. He was sentenced to life imprisonment at hard labor without benefit of parole, probation, or suspension of sentence on April 20, 2007. This appeal follows.
FACTS
The victim, K.J., testified that her stepfather, defendant, sexually abused her on six occasions during "the second grade and the third grade."[1] She testified in detail that the abuse included anal penetration, vaginal penetration, and oral sexual intercourse. The victim testified that she was twelve years old and in the fifth grade at the time of trial, March 14, 2007. The victim stated that she first reported the abuse in part to R.J., her brother, and J.J., her mother. She testified that she later reported the abuse to Essie Thomas, her school's social worker. The victim also testified that she reported the abuse to "people from Child Protection," Gretna police officers, and Omalee Gordon of the Children's Advocacy Center. The victim further stated that she reported the abuse to Dr. Ellie Wetsman at Children's Hospital.
Specifically, K.J. testified that the incidents of abuse occurred in her mother's and stepfather's bedroom while her mother was at work. She alleged that Defendant brought her into his bedroom to lay her on the bed and "throw a pillow" over her head. She alleged that Defendant would undress in an adjacent bathroom and would return naked, which she saw in a mirror on the side of the bedroom despite the pillow. She explained that she had "nothing on but my shirt" and defendant "would put his thing in my butt." She testified that this experience was painful and that "[s]ometimes it would be wet. And sometimes, it would be dry." She then stated that defendant threatened her to remain silent about the incident and that she was scared.
She testified that defendant "would smell my underwear, seeing did I take a shower." Defendant "would put his private part and rub it on mines." Further, she said, "he licked my private part to see did I take a shower," using a blue towel in the process, according to the victim's narration. She further detailed an incident when she was kneeling: Defendant was standing in front of her and told her to "suck his private part." She reports that defendant asked her "did that feel good?" and testified that it tasted "nasty." In response to "when he finished making you lick his front private part, was your mouth dry or was it wet?", she answered "[i]t was wet" and "[i]t looked like spit." She then stated that she told her brother, R.J., who notified their mother, J.J., but did not tell them the entire story because she was scared of defendant. On cross-examination, the victim confirmed that all incidents of abuse occurred in his bedroom. On redirect examination, the victim affirmed that no one told her how to testify.
*150 Essie Thomas, social worker at the victim's school, explained how the victim was referred to Thomas on four occasions for "a hygiene problem" during her time in the second grade. Other school employees had "said she smelled like sex."[2] The victim did not disclose any abuse to Thomas on those occasions. Thomas testified that on May 4, 2005, the victim disclosed to her six incidents of sexual abuse by defendant including anal penetration and oral sexual intercourse.
Thomas Gray, a Gretna police officer, testified that he met with the victim on May 4, 2005 and that the victim was ten years old at the time. Gray testified that the victim disclosed to him six incidents of sexual abuse by defendant including acts of anal penetration and oral sexual intercourse. Alfred Disler, a Gretna police officer, also testified that he met with the victim on May 4, 2005. Disler testified that on May 4, 2005, the victim disclosed to him without detail six incidents of sexual abuse by defendant. On redirect examination, Disler stated that the victim has not recanted her accusations in his presence. James Belton, III, the victim's biological father, also testified that the victim has not recanted her accusations in his presence.
Dr. Ellie Wetsman was qualified as an expert in the field of pediatric forensic medicine. She testified that on May 10, 2005, she conducted a physical examination of the victim. She explained that because the most recent incident of abuse was beyond 72 hours old at the time of the victim's referral on May 4, it was unlikely that any physical evidence of abuse would have been present, and therefore the victim's condition had not been considered emergent. She testified that a "loop" mark was present on the victim's thigh, which is indicative of being beaten with an object in that shape, such as a belt buckle. This, she felt, corroborated the victim's claims that she had been whipped by the defendant.
Dr. Wetsman testified that the victim reported to her six incidents of sexual abuse by defendant including acts of anal penetration, vaginal penetration, and oral sexual intercourse. She related that the victim complained during the examination of recurrent rectal bleeding associated with the incidents of abuse. The State then offered into evidence an audio recording of the victim's statement to Dr. Wetsman (State's Exhibit 7), which was played for the court, and a transcript of that recording (State's Exhibit 8).
Dr. Wetsman then testified that the victim tested positive for trichomonas, a sexually transmitted parasite. Dr. Wetsman stated that "the absence of physical evidence from the anal/genital exam was also consistent with the history that [the victim] gave." She explained that the hymen is "designed to be penetrated without injury," despite that "[m]ost of us were brought up to believe" the contrary. She further explained that injuries to the mouth and anus heal very quickly. Dr. Wetsman also stated that the victim's report of rectal bleeding is consistent with anal penetration. Dr. Wetsman then noted that the victim did not recant her accusations.
On cross-examination, Dr. Wetsman testified that she found no physical evidence of rectal bleeding. She also conceded that trichomonas can be transmitted via wet towels and clothing, that she was unable to determine the source of the victim's infection, and that she was not aware of any findings tending to show that defendant was infected with trichomonas.
*151 Omalee Gordon, forensic interviewer for the Children's Advocacy Center, testified that she recorded on video her May 6, 2005 interview with the victim. She described the procedures used in making the video, in order that it might be authenticated. The video recording was then entered into evidence as State's Exhibit 9 and played for the court. A review of the recording reveals no contradiction within the victim's testimony, and the victim details therein six incidents of sexual abuse by defendant including acts of anal penetration, vaginal penetration, and oral sexual intercourse. The State entered into evidence Exhibits 2 and 3, which are drawings by the victim marking the places that defendant touched the victim and the places where defendant compelled the victim to touch him.
Dr. Scott Benton was qualified as an expert in the field of forensic pediatric medicine. He explained that most evidence of physical and sexual abuse is not recoverable after 24 hours, but that his employer, the Children At Risk Evaluation Center, considers a patient emergent if the abuse was within the previous 72 hours. He also explained how children tend to delay in their disclosure of abuse. Dr. Benton then testified that vaginal penetration will not necessarily cause injury or scarring of the hymen. He testified that most vaginal injuries from abuse heal in a matter of days and that most anal injuries heal within a week. Dr. Benton then testified that young children may have very accurate memories of what happened to them, but may have lacked the "temporal awareness" to recall exactly when events occurred.
Dr. Benton testified further that the presence of trichomonas in a juvenile is a "suggestive finding," which means that the finding occurs "predominantly in a person who's had sexual activity or sexual assault." He explained that though trichomonas has been found on wet towels and in hot tubs, no scientific literature has demonstrated that the organism is infectious outside of human bodies. Dr. Benton then testified that, after reviewing the evidence, his expert opinion on the case was that the victim gave a clear and consistent history of sexual abuse by the defendant.
On cross-examination, Dr. Benton agreed that a person can be a pedophile at any age, but most people "decide what they're interested in sexually much earlier" than defendant's age, 35. On redirect examination, Dr. Benton affirmed that trichomonas is one of the most infectious of sexually transmitted diseases: "pretty much, the rule is, if you have sex with someone who has trichomonas, you've got trichomonas."
J.J., the victim's mother, testified for the defense. She testified that she and defendant met in 1999 and married in 2000. She stated that defendant attempted to instill "a little discipline" for the children, and that the victim did not like it. J.J. testified that the victim frequently expressed that she wanted J.J. to reunite with the victim's father.
J.J. explained that during the time in question, she had to be at work by 7:30 a.m., her son had to be at school by 7:25 a.m., and the victim had to be at school generally by 8:30 a.m. J.J. stated that defendant had to be at work by 4:00 p.m. and generally stayed there until 1:00 or 2:00 a.m., and then would return home at 4:00 or 5:00 a.m., at which point he would watch television and relax, and then go to bed when the witness was waking for work, typically falling asleep before the children woke for school. She then testified that the victim disclosed the abuse in part to R.J., the victim's brother, who then informed her, in January 2005. When J.J. confronted the victim, "She, kind of, smiled *152 at me, and she said, [defendant] touched me," and observed that the victim did not seem upset when she disclosed this incident.
J.J. then explained how she bought a Spy Tech pin-sized video camera, set it up in defendant's bedroom, and recorded defendant while she was at work from February 2005 through April 2005. She stated that she reviewed the tapes every day and that they revealed no incidents of defendant abusing the victim. The only interaction between defendant and the victim that the tapes revealed was that the victim would enter the bedroom and inform defendant, who was typically sleeping, that she was leaving for school; on occasion, he would rise to lock the door after the victim left for school. The witness testified that she never saw defendant do anything sexual or inappropriate to the victim and that she would have called the police had she witnessed anything sexual or inappropriate. She stated that she had discarded the tapes.
J.J. then testified that one week prior to the victim's report of abuse, she and R.J. had watched a film depicting "a woman allowing a man to come into her home, and he raped her daughter." After the film, she and R.J. discussed its content, and agreed that if defendant ever were to touch the victim, they "would put him out." She also testified that she had been infected with trichomonas in 1997 (three years before marrying the defendant). She then stated that the victim does not have a history of being completely honest and that she is certain that her daughter's testimony is not truthful.
On cross-examination, J.J. agreed that defendant did have an opportunity to be alone at home with the victim, and that she did not know what occurred in the house during those times. Though she did not believe that defendant had sexual relations with the victim, she admitted that she could not tell the court that he did not in fact have such relations. She also clarified that though she had trichomonas in 1997, she was given medication at the time to treat the infection. On redirect examination, she testified that defendant has never tested positive for trichomonas.
R.J., the victim's brother, testified that the victim confided in him that defendant had touched her. He testified that J.J., upon learning of the victim's accusation, purchased a pinhole camera and installed it in the house, and that defendant did not find the camera. He moreover testified that the victim does not have a history of always being truthful. On cross-examination, he testified that his mother no longer possessed the video recordings of defendant made with the pinhole camera.
Defendant testified that he worked as a cook from 4:00 p.m. to "close," 12:00 or 1:00 a.m. He stated that after work, he would go to a friend's home to compose music. He testified that his relationship with J.J.'s children was difficult at first, but that it eventually improved with R.J. He stated that the victim both demanded more affection than he was willing to give and resisted his efforts to make her into an "independent person." He stated that he may have been too strict with the victim and that he on occasion would whip her with a belt because she left dirty dishes in her room and thereby drew rats into the house, but that he did not enjoy whipping her.
Defendant denied having any sexual relationship with the victim, denied touching her in an inappropriate way, denied having sex with any child, denied sexual attraction to children in general, and denied being a pedophile. He averred that his amorous relationships are with adult women and that he never had trichomonas. He stated that the State requested consent to test *153 him for trichomonas, which he granted, but the State never conducted the test. He stated that he has never shown any symptoms of a sexually transmitted disease and that he loved the victim as a father.
On cross-examination, defendant testified that the victim never expressed to him that her accusations were lies intended to reunite her with her biological father, or designed as revenge for harsh discipline, or modeled on a film that her mother and brother had watched. He also testified that he was at home alone with the victim in the mornings. He agreed that there was a blue towel in the house. He then disputed the victim's descriptions of the incidents of sexual abuse, explaining that her specific description of what she saw in his bedroom mirror is impossible considering the architecture of the house. Defendant then denied various specific acts of oral sexual intercourse and anal penetration. He stated that he is a person who admits his wrongdoings, as evidenced by his pleas of guilty on previous convictions for possession of various narcotic drugs.
ASSIGNMENT OF ERROR NUMBER ONE
Defendant argues that the trial court erred in failing to grant a new trial. Defendant challenges the sufficiency of the evidence to find him guilty beyond a reasonable doubt. Furthermore, defendant argues that the trial court erred when it granted the State's Motion in Limine to exclude defense evidence under the Louisiana rape shield statute, LSA-C.E. art. 412.
When an appeal raises both sufficiency of evidence and one or more trial errors, the reviewing court should first determine the sufficiency of the evidence by considering the entirety of the evidence. State v. Hearold, 603 So.2d 731, 734 (La.1992). If the reviewing court determines that the evidence was insufficient, then the defendant is entitled to an acquittal, and no further inquiry as to trial errors is necessary. Id.
The constitutional standard for testing the sufficiency of the evidence, as enunciated in Jackson v. Virginia,[3], requires that a conviction be based on proof sufficient for any rational trier-of-fact, viewing the evidence in the light most favorable to the prosecution, to find the essential elements of the crime beyond a reasonable doubt.[4] The judgment of witness credibility is within the sound discretion of the trier-of-fact, who may accept or reject, in whole or in part, the testimony of any witness.[5] Where conflicting testimony produces an issue of material fact that requires for its resolution the determination of witness credibility, the trier-of-fact's resolution is a matter of weight, not sufficiency, of the evidence.[6]
In the absence of internal contradiction or irreconcilable conflicts with physical evidence, the testimony of one witness, if believed by the court, is sufficient to support a conviction.[7] In the case of sexual offenses, the testimony of the victim alone can be sufficient to establish the elements of a sexual offense, even *154 where the State does not introduce medical, scientific or physical evidence to prove the commission of the offense.[8]
The State presented evidence at trial that defendant committed an act of anal penetration, vaginal penetration, or oral sexual intercourse on as many as six occasions with the victim when she was under the age of 12. This evidence was presented in a clear and consistent manner directly by the victim, both in live testimony as well as video and audio recordings, and indirectly by those to whom the victim reported the incidents.
The victim's account of the abuse was consistently related to Ms. Thomas, Dr. Wetsman, Ms. Gordon, and Dr. Benton. Additionally, evidence of a beating was corroborated by physical evidence, the scar on the victim's leg. There were no internal conflicts in the victim's multiple accounts of the abuse, nor were there any irreconcilable conflicts with the physical evidence offered by the state. Accordingly, we find that the State presented sufficient evidence with which to convict defendant of the crime charged.
Defendant argues that the trial court erred in denying his Motion for New Trial, which was based on the pre-trial exclusion of his evidence that the victim had made prior false allegations of sexual assault. The State had filed a Motion in Limine under LSA-C.E. art. 412 to prohibit defendant from introducing any evidence regarding the past sexual conduct of the victim, including any of the victim's prior allegations of sexual assault. At the hearing, defendant argued that the victim had made prior false allegations of sexual misconduct against her brother, R.J. The State conceded that the victim had made a prior allegation against her brother, but did not concede that the allegation was false. This Motion was granted over defendant's objection. In arguing the Motion, defendant did not proffer any evidence or otherwise specify which witnesses would testify about a prior false allegation.
Defendant's Motion for New Trial claims that the trial court erred in preventing the cross examination of the victim with regard to prior accusations against R.J. and her grandfather, and in preventing R.J. and J.J. from testifying as to the details of the victim's history of false allegations. Defendant has attached to this Motion an affidavit by R.J., executed more than a month after trial on April 17, 2007, claiming that the victim, "my sister, Jamika [sic][J.]" had made false allegations of sexual molestation against R.J. and their grandfather.[9] At the hearing on the Motion for New Trial, defendant argued that the pre-trial Article 412 ruling was erroneous and that the R.J. affidavit should be entered into evidence. The court denied the Motion for New Trial and refused to accept the R.J. affidavit into evidence.
Defendant argues on appeal that under State v. Smith, 98-2045, pp. 5-6 (La.9/8/99), 743 So.2d 199, 203, the rape shield statute is inapplicable to evidence of prior false accusations of sexual misconduct offered for impeachment purposes.
The State responds in its appellee brief that the evidence of prior false allegations of sexual misconduct by the victim was properly excluded under LSA-C.E. art. 412. The State also argues that defendant introduced evidence after trial regarding the prior false allegations of sexual misconduct *155 allegedly leveled at the victim's grandfather, and that this evidence was rightly excluded and moreover is not properly before this Court. The State then argues that defendant presented no evidence that the victim made allegations or that the allegations were false at the time of the pre-trial hearing. The State contends that the case at bar is distinguishable from Smith because this case presents only defendant's assertion that the statements were false.
On motion of a defendant, the trial court shall grant a new trial whenever the court's ruling on a written motion, or an objection made during the proceedings, shows prejudicial error. LSA-C.Cr.P. art. 851(2). A trial judge's ruling on a Motion for New Trial will not be disturbed on appeal absent a clear showing of an abuse of discretion.[10] The verdict of a jury generally will not be set aside and a new trial granted for the sole purpose of enabling the accused to impeach testimony admitted at trial. State v. Heintz, 174 La. 219, 222, 140 So. 28, 29 (1932).
We first consider the ruling on the Motion in Limine. We find that under State v. Smith, 98-2045, pp. 5-6 (La.9/8/99), 743 So.2d 199, 203, C.E. art. 412 is inapplicable in sexual assault cases where the defendant seeks to question witnesses regarding the victim's prior false allegations concerning sexual behavior for impeachment purposes. In that case, the court ruled that because Article 412 was inapplicable, an Article 412 hearing to determine the admissibility of that evidence should not have been held. Rather, when considering the admissibility of such evidence, the question for the trial court was not whether it believed that the prior allegations were false, but whether reasonable jurors could find, based upon the evidence presented by the defendant, that the victim had made prior false accusations. After reviewing testimony of the victim, who admitted making the allegations, and other witnesses regarding those allegations, the court determined that the defendant had presented sufficient evidence to allow reasonable jurors to find that the victim has made false allegations of molestation in the past, and as such, this evidence should have been admitted, provided the trial court found it met all other standards for admissibility.
Further, the court found that since the outcome of that case rested entirely upon the jury's perception of the victim's veracity, the trial court's ruling denying the admission of the impeachment evidence could not be said to be harmless. Smith's conviction was reversed and the matter remanded for a new trial.
It is an abuse of discretion for a trial court to exclude evidence of prior false allegations of sexual misconduct where the "prosecutrix admitted the prior accusation (albeit she did not concede that the accusation was false) and defendant presented the testimony of an independent third party that the prior accusation was false."[11]
In Wallace,[12] however, this Court rejected the defendants prior false allegation argument because [t]he defendants mere assertion that the alleged statement was made and that it was false does not satisfy the Smith test.[13] Consequently, it is no *156 abuse of discretion for a court to exclude evidence of prior false allegations of sexual misconduct when that evidence is based on the mere assertion of the defendant.[14]
Although Smith holds that an Article 412 hearing is unnecessary, a hearing was held prior to trial to address the State's Motion in Limine. At that hearing, defendant failed to present the testimony of any witness or proffer any, or in any way describe the nature of the allegedly false allegation. Accordingly, unlike the Smith court, this Court is not in a position to determine whether the defendant had sufficient evidence to put before a jury or if that evidence was otherwise admissible.
In the second part of this Assignment of Error, the State argues that R.J.s affidavit is not properly before this Court, citing State v. Jordan, 02-820, pp. 3-4 (La.App. 5 Cir. 12/30/02), 836 So.2d 609, 611, for the proposition that new bases of objection may not be raised on appeal, and to Uniform Rules, Courts of Appeal, Rule 1-3 for the proposition that this Court may only review claims submitted to the trial courts at the time of trial. However, in this case, defendant is not raising the allegations against the grandfather for the first time on appeal, as this issue is articulated in the Motion for New Trial.
We find that the affidavit was properly excluded. Therein, R.J. refers to his sister, the victim as "Jamika," which is not the victim's name. No explanation is provided for this misidentification.
Additionally, defendant has not met the stringent standard for receiving a new trial based upon newly discovered evidence. In the affidavit, R.J. alleges that the victim made prior false allegations of molestation about his grandfather, which, arguably, is new evidence. When the Motion for New Trial is based on newly discovered evidence, the following four requisites must be met: (1) the evidence must have been discovered since the trial; (2) the failure to learn of the evidence at the time of trial was not due to defendant's lack of diligence; (3) the evidence must be material to the issues at trial; and, (4) the evidence must be of such a nature that it would probably produce an acquittal in the event of a retrial.[15] Defendant failed to show 1) and 2). Further, while R.J. might be able to state that the alleged allegations against him were false, such a statement regarding the allegations against the grandfather are conclusions, and do not conform with the admissibility requirements under State v. Smith.
ERROR PATENT REVIEW
The record was reviewed for errors patent.[16] First, the State has noted that the delays between ruling on the Motion for New Trial and sentencing were not observed and were not waived, as per LSA-C.Cr.P. art. 873. However, no corrective action is necessary. Because the defendant received the mandatory life sentence for this offense, defendant cannot show prejudice from the failure to observe this delay.
Second, the record does not reflect that defendant was notified of Louisiana's *157 sex offender registration requirements in accordance with LSA-R.S. 15:541 et seq. LSA-R.S. 15:542 outlines mandatory registration requirements for those categorized as sex offenders under LSA-R.S. 15:541(14.1), and child predators. Additionally, LSA-R.S. 15:542.1 sets out notification requirements for those offenders categorized as sex offenders and child predators. LSA-R.S. 15:543 A requires the trial court to provide written notice to all sex offenders and child predators of the aforementioned registration and notification requirements.[17]
Accordingly, we remand and order the trial judge to inform the defendant of the registration and notification requirements as provided in LSA-R.S. 15:543 A, by sending appropriate written notice to the defendant within ten days of this Court's opinion, and by filing written proof in the record that defendant received such notice.[18]
AFFIRMED.
NOTES
[1] The victim's initials are used under the authority of R.S. 46:1844(W)(3).
[2] Defense counsel objected to this testimony as hearsay; the court admitted the evidence not for the truth of the matter asserted, but as res gestae. (Id.).
[3] 443 U.S. 307, 319, 99 S.Ct. 2781, 2789, 61 L.Ed.2d 560 (1979).
[4] State v. Shank, 05-421, pp. 5-6 (La.App. 5 Cir. 2/14/06), 924 So.2d 316, 321, writ denied, 06-1176 (La. 11/17/06), 942 So.2d 531.
[5] State v. Simms, 03-1459, p. 15 (La.App. 5 Cir. 12/28/04), 892 So.2d 111, 121.
[6] Simms, 03-1459 at pp. 15-16, 892 So.2d at 121.
[7] State v. Stec, 99-633, pp. 4-5 (La.App. 5 Cir. 11/30/99), 749 So.2d 784, 787.
[8] State v. Hotoph, 99-243, p. 13 (La.App. 5 Cir. 11/10/99), 750 So.2d 1036, 1045, writ denied, 99-3477 (La.6/30/00), 765 So.2d 1062 and 00-0150 (La.6/30/00), 765 So.2d 1066.
[9] J.J. testified that K.J. and R.J. are her children. Nothing in R.J.'s testimony otherwise indicates a sibling in addition to the victim.
[10] State v. Davis, 06-402, p. 11 (La.App. 5 Cir. 11/28/06), 947 So.2d 48, 55, writ denied, 07-0003 (La.9/14/07), 963 So.2d 996.
[11] Smith, 98-2045 at p. 6, 743 So.2d at 203.
[12] State v. Wallace, 00-1745, p. 13 (La.App. 5 Cir. 5/16/01), 788 So.2d 578, 587, writ denied, 01-1849 (La.5/24/02), 816 So.2d 297.
[13] Wallace, 00-1745 at p. 14, 788 So.2d at 587.
[14] See also State v. Bolden, 03-0266, p. 17 (La.App. 5 Cir. 7/29/03), 852 So.2d 1050, 1062, writ denied, 05-2030 (La.4/28/06), 927 So.2d 279.
[15] LSA-C.Cr.P. arts. 851(3), 854; State v. Bolden, 03-0266 (La.App. 5 Cir. 7/29/03), 852 So.2d 1050.
[16] LSA-C.Cr.P. art. 920; State v. Oliveaux, 312 So.2d 337 (La. 1975); State v. Weiland, 556 So.2d 175 (La.App. 5 Cir.1990).
[17] Prior to January 1, 2008, the notice requirement for child predators was contained in LSA-R.S. 15:542.1 C, and the notice requirement for sex offenders was found in LSA-R.S. 15:543 A.
[18] See State v. Gaddis, 07-395, p. 6 (La.App. 5 Cir. 11/13/07), 973 So.2d 21; State v. Stevenson, 00-1296, p. 4 (La.App. 5 Cir. 1/30/01), 778 So.2d 1165, 1166-67.