SUSAN M. CHEHARDY, Chief Judge.
| ^Defendant appeals his convictions of attempted forcible rape and indecent behavior with a juvenile. For the following reasons, we affirm.

Procedural History

On August 5, 2009, the Jefferson Parish District Attorney filed a bill of information charging defendant, Derrick Alexander, with forcible rape in violation of LSA-R.S. 14:42.1, to which he pled not guilty. Subsequently, on October 11, 2011, the district attorney filed an amended bill of information, charging defendant with the additional offense of indecent behavior with a juvenile in violation of LSA-R.S. 14:81. Defendant was arraigned on the amended bill and pled not guilty.
On November 8, 2011, after a two-day trial, the twelve-person jury found defendant guilty of the responsive verdict of attempted forcible rape and guilty as charged of indecent behavior with a juvenile. On December 2, 2011, after the trial court denied defendant’s motions for new trial and post-verdict judgment of acquittal, defendant waived sentencing delays and was sentenced, on the attempted forcible rape, to twenty years imprisonment at hard labor, and on the indecent ^behavior with a juvenile, to seven years imprisonment at hard labor.
Also on that day, after sentence had been imposed, the State filed a multiple offender bill of information on each count, alleging defendant to be a third felony offender. After adjudicating defendant a third felony offender, the trial court vacated defendant’s sentences on both counts and imposed concurrent enhanced sentences of life imprisonment at hard labor without benefit of parole, probation, or suspension of sentence.[1] Thereafter, the trial court denied defendant’s motion to reconsider sentence and granted his motion for appeal.

Facts

At approximately 7:15 p.m. on April 25, 2009,13-year-old D.M.,[2] the victim, visited *123 the house of M.D. to have M.D. braid her hair. M.D., the wife of defendant,[3] is the cousin of D.M.’s “father,” T.C.[4] At the time, M.D. resided at 4280 East Ames Boulevard in Jefferson Parish with her three children, of whom the oldest was ten years of age. Although defendant did not reside at this residence, there was testimony that he had a key.
When D.M. arrived, M.D. was there, along with her three children. M.D. started to braid D.M.’s hair, but stopped midway when she prepared to leave the house. Before leaving, M.D. called T.C. to ask if D.M. could spend the night, to which T.C. agreed. The testimony indicates that M.D. left the house sometime between 10:00 and 11:30 p.m., leaving D.M. alone with her children. Defendant arrived at the house approximately one hour after M.D. left.
When defendant arrived, D.M. exited the room where she had been watching television, and when she returned, noticed that defendant had a “nasty” Rmovie on. Defendant asked D.M. if she watched “nasty” movies; she told him “no.” Defendant asked if she had a boyfriend and if he could be her “sideline boyfriend.” D.M. left to go to the children’s room, but soon returned to watch more television, where defendant had evidently stopped watching the “nasty” movie. While D.M. watched television, defendant began “touching” her. D.M. left the room, at which point, defendant left the house to go to McDonald’s. It appears that at some point after defendant returned with food for the children— the chronology of events is not clear— defendant resumed his physical advances towards D.M.: rubbing her, touching her genitals with his hands, and kissing her neck and breasts. D.M. tried to push defendant away and told him to stop, but he did not. He then pulled off her pants and underwear, removed his pants and underwear, rolled on top of her, and put his “private part,” which D.M. indicated is his penis, into her “private part,” which she indicated is her vagina. D.M. then retreated into the bathroom to wipe herself off. Following these events, defendant gave D.M. $100.00 and wrote his phone number down for her. D.M. threw the number in the garbage.
D.D., defendant’s eldest child, testified to a different version of events. D.D. stated that when M.D. left the house that night, D.D., her two younger sisters, and D.M. were watching a movie in her bedroom. D.D. only saw defendant one time that night: when he brought them McDonald’s. After eating, they all fell asleep in the same bed; D.D. never saw D.M. leave the room and never heard a struggle in another room. The next morning, when D.D. spoke with D.M., she did not indicate anything had happened the night before.
M.D. arrived back home between 3:45 and 4:00 a.m. on April 26, 2009. As she arrived, she noticed that defendant was asleep in his truck and she did not know where he had been between 7:00 p.m. and 3:45 a.m. that night.
At some point over the next two days, D.M. told T.C. that defendant had 15“raped” her. T.C. took D.M. to M.D.’s *124 house, where D.M. told M.D. what had happened. Thereafter, M.D. called the police, which she explained at trial she only did because T.C. was threatening to harm defendant with “sticks.”
In the early evening of April 27, 2009, Deputy Mark Monson of the Jefferson Parish Sheriffs Office responded to the call. When he arrived, the deputy encountered D.M., T.C., and M.D. standing outside. T.C. appeared angry and teary-eyed, while D.M. seemed timid and nervous with shaky hands. Deputy Monson separated T.C. and D.M. and obtained an account of the events from each. T.C. told the deputy that defendant had raped D.M.; and D.M. gave the deputy a near-verbatim account of what T.C. had said. The deputy found the level of detail in D.M.’s story to be noteworthy. He especially found it significant that D.M. was able to recite defendant’s phone number.
Deputy Monson then spoke with M.D., who “told him all the same stuff,” including that defendant was asleep in bed when she got home that night. M.D. also gave the deputy defendant’s phone number, which he confirmed was the same as D.M. had specified. However, at trial, M.D. denied talking to Deputy Monson that day, denied giving him defendant’s phone number, and claimed defendant was asleep in his truck, not his bed, when she got home that night.
After speaking with these three individuals, Deputy Monson contacted Detective Terri Dana in the personal violence section of the Jefferson Parish Sheriffs Office. Detective Dana, along with Detective Nick Vega, responded to the scene. Upon the detectives’ arrival, D.M. and T.C. were not there as they had gone to Children’s Hospital for a sexual assault exam. Detective Dana spoke with Deputy Monson, who relayed all the information he had gathered. The detective then spoke with M.D., who consented to have her house photographed and scanned with a light used to detect bodily fluids. The scan did not detect any bodily fluids. The detectives then proceeded to defendant’s residence, where they encountered |fihis mother, Lillian Alexander, who informed them that defendant was not home at the time.
Meanwhile, Dr. Eva Blanche Centanni of Children’s Hospital conducted a sexual assault exam of D.M., in which D.M. described the details of the incident. The doctor did not find any physical trauma to D.M.’s body or vagina, which she explained is not uncommon in sexual abuse cases, the majority of which lack clear medical evidence. During the vaginal exam, Dr. Centanni discovered a discharge which possessed the characteristics of semen, however, subsequent tests revealed semen was not present.
In addition, D.M.’s lab tests came back positive for syphilis; however, Dr. Stephanie Taylor, an expert in the field of sexually transmitted diseases, testified that the latency period was not long enough for D.M. to develop syphilis from this incident. Indeed, D.M.’s medical records confirmed that she was born with congenital syphilis and tests indicated that defendant was not infected with the disease.
Dr. Jamie Jackson of the Audrey Hepburn Care Center at Children’s Hospital and an expert in child abuse pediatrics reviewed photographs that had been taken during D.M.’s vaginal exam. Dr. Jackson found D.M.’s hymen to be normal, which was corroborated by a peer review of other physicians. Dr. Jackson also did not find any evidence of physical trauma, which he explained is not uncommon in cases of sexual assault.
In May of 2009, Detective Dana obtained an arrest warrant for defendant, who was subsequently taken into custody by U.S. Marshals. After defendant’s arrest, De *125 tective Kelly Jones of the Jefferson Parish Sheriffs Office met with defendant at the detective bureau on June 9, 2009, where he advised him of his rights. Defendant cannot read or write, so Detective Jones read the advice of rights form to defendant, who signed his name, indicating he understood his rights. |7When the waiver of rights portion was read to him, defendant said he had nothing to say but then denied knowing the victim, being at the house that night, and raping anyone.
On August 6, 2009, Staci Lanza, a juvenile forensic interviewer with the Gretna Police Department, conducted a recorded interview with D.M. in which D.M. described the incident as she did to Deputy Monson, Dr. Centanni, and subsequently at trial.
Amanda Calogero, a child abuse screen-er with the Jefferson Parish District Attorney’s Office, also met with D.M. Ms. Ca-logero testified about details D.M. omitted from her other accounts of the incident. D.M. told Ms. Calogero that at one point during the incident she tried to call out, but that defendant stuck something sticky over her mouth and at another point, defendant forced her into the bathtub. Ms. Calogero explained that it is not uncommon for a child victim of sexual abuse to disclose more details as time passes.
Adriana Perez, an expert in the field of forensic DNA analysis, conducted tests on D.M.’s underwear. Of three samples taken from the victim’s underwear, one indicated the presence of male DNA, but the quantity and quality of the genetic material was insufficient to generate a profile for comparison purposes. Also present on this sample were secretions from the male prostate gland, but spermatozoa were not observed. Another sample indicated the presence of a mixture of genetic material from at least two individuals, of which D.M. could not be excluded as a donor, but defendant was.
Joseph Trawicki, a records custodian for Sprint Nextel, testified regarding incoming and outgoing calls on defendant’s cell phone beginning at 10:09 p.m. on April 25 and ending at 4:22 a.m. on April 26, 2009. Mr. Trawicki was able to approximate the location of defendant’s cell phone throughout the night. He opined that the phone was moving, and that the movement indicated a back-and-Jforth8 pattern, as if the cell phone user was leaving and returning to a location.
Lillian Alexander, defendant’s mother, testified that defendant was working on her Katrina-damaged house on April 25 and 26, 2009. She explained that defendant left for M.D.’s house at one point that night to bring the children McDonald’s and that after returning, he later left her house around 2:30 or 3:00 a.m. on April 26. She further described that she learned of the allegations against her son when he told her about it in tears. Defendant told his mother he would never do anything like that.

Law and Argument

On appeal, defendant raises two counseled assignments of error and one supplemental pro se assignment of error. In his counseled assignments, defendant argues that the evidence was insufficient to support his convictions and that the trial court erred in reading a flight instruction to the jury. In his pro se assignment, he argues that the trial court erred in denying his motion for new trial on the grounds that: (1) defendant’s right to a fair trial was violated when the State introduced perjured evidence, (2) the trial court erred in instructing the jury on flight, and (3) the evidence was insufficient to support his convictions.
*126 When the issues on appeal relate to both the sufficiency of evidence and one or more trial errors, the reviewing court should first determine the sufficiency of the evidence. State v. Hearold, 603 So.2d 731, 734 (La.1992). If the appellate court determines that the evidence was insufficient, then the defendant is entitled to an acquittal, and no further inquiry as to trial errors is necessary. Id. Thus, we will first address those assignments of error which relate to the sufficiency of the evidence.
As a preliminary matter, although this Court has recognized that the denial of a motion for new trial based on insufficient evidence is not subject to review on appeal, both the Louisiana Supreme Court and this Court have nonetheless addressed such claims under these circumstances. See State v. Bazley, 09-358, pp. 17-18 (La.App. 5 Cir. 1/11/11), 60 So.3d 7, 19, writ denied, 11-0282 (La.6/17/11), 63 So.3d 1039 (citation omitted). Accordingly, we consider defendant’s argument that the trial court erred in denying his motion for new trial on the ground that the evidence was insufficient to support the verdict.
In reviewing the sufficiency of the evidence, an appellate court must determine that the evidence, whether direct or circumstantial, or a mixture of both, viewed in the light most favorable to the prosecution, was sufficient to convince a rational trier of fact that all of the elements of the crime have been proven beyond a reasonable doubt. Jackson v. Virginia, 443 U.S. 307, 99 S.Ct. 2781, 61 L.Ed.2d 560 (1979); State v. Neal, 00-0674, p. 9 (La.6/29/01), 796 So.2d 649, 657, cert. denied, 535 U.S. 940, 122 S.Ct. 1323, 152 L.Ed.2d 231 (2002); State v. Mickel, 09-953, p. 4 (La.App. 5 Cir. 5/11/10), 41 So.3d 532, 534, writ denied, 10-1357 (La.1/7/11), 52 So.3d 885.
Under the Jackson standard, a review of the record for sufficiency of the evidence does not require the court to ask whether it believes that the evidence at the trial established guilt beyond a reasonable doubt. State v. Jones, 08-20, p. 6 (La.App. 5 Cir. 4/15/08), 985 So.2d 234, 240. Rather, the reviewing court is required to consider the whole record and determine whether any rational trier of fact would have found guilt beyond a reasonable doubt. Id., 08-20 at 7, 985 So.2d at 240.
When the trier of fact is confronted by conflicting testimony, the determination of that fact rests solely with that judge or jury, who may accept or reject, in whole or in part, the testimony of any witness. State v. Bailey, 04-85, p. 4 (La.App. 5 Cir. 5/26/04), 875 So.2d 949, 955, writ denied, 04-1605 (La.11/15/04), 887 So.2d 476, cert. denied, 546 U.S. 981, 126 S.Ct. 554, 163 L.Ed.2d 468 (2005). In the absence of internal contradiction or irreconcilable conflicts with physical evidence, the testimony of one witness, if believed by the trier of fact, is | ^sufficient to support a conviction. State v. Dixon, 07-915, p. 11 (La.App. 5 Cir. 3/11/08), 982 So.2d 146, 153, writ denied sub nom., State ex rel. Dixon v. State, 08-0987 (La.1/30/09), 999 So.2d 745. Specifically in sex offense cases, the testimony of the victim alone can be sufficient to establish the elements of a sexual offense, even where the State does not introduce medical, scientific, or physical evidence to prove the commission of the offense. Id., 07-915 at 11, 982 So.2d at 153-54.
With respect to defendant’s attempted forcible rape conviction, he was charged with forcible rape, but found guilty of the responsive verdict of attempted forcible rape in violation of LSA-R.S. 14:27:42.1. When a defendant does not object to a legislatively responsive verdict, the defendant’s conviction will not *127 be reversed, whether or not that verdict is supported by the evidence, as long as the evidence is sufficient to support the offense charged. State ex rel. Elaire v. Blackburn, 424 So.2d 246, 252 (La.1982), cert. denied, 461 U.S. 959, 103 S.Ct. 2432, 77 L.Ed.2d 1318 (1983); State v. Austin, 04-993, p. 13 (La.App. 5 Cir. 3/1/05), 900 So.2d 867, 878, writ denied, 05-0830 (La.11/28/05), 916 So.2d 143. In the present case, defendant did not lodge an objection to the responsive verdicts, which included attempted forcible rape. Accordingly, defendant is entitled to a reversal of his conviction only if the evidence is insufficient to support a conviction of the charged offense, forcible rape.
At the time of the offenses,[5] LSA-R.S. 14:42.1(A)(1) defined forcible rape in pertinent part as:
[R]ape committed when the anal, oral, or vaginal sexual intercourse is deemed to be without the lawful consent of the victim because it is committed ... [w]hen the victim is prevented from resisting the act by force or threats of physical violence under circumstances where the victim reasonably believes that such resistance would not prevent the rape.
InLSA-R.S. 14:81 defined indecent behavior with juveniles in pertinent part:
A. Indecent behavior with juveniles is the commission of any of the following acts with the intention of arousing or gratifying the sexual desires of either person:
(1) Any lewd or lascivious act upon the person or in the presence of any child under the age of seventeen, where there is an age difference of greater than two years between the two persons.
On appeal, defendant argues that D.M.’s inconsistent statements and the absence of physical evidence rendered the evidence insufficient to find him guilty beyond a reasonable doubt of attempted forcible rape and indecent behavior with a juvenile. At trial, the State presented the testimony of the victim and several others to prove that defendant was guilty of these offenses. In sum, D.M. testified that on April 25, 2009, she encountered defendant while at M.D.’s house. At some point that night, defendant made sexual advances towards D.M., touching her and kissing her neck and breasts. These advances culminated when, against D.M.’s protests, defendant pulled off D.M.’s pants, rolled on top of her, and put his “private part” into her “private part.” This incident was reported to the police two days later. Deputy Monson of the Jefferson Parish Sheriffs Office, Dr. Centanni of Children’s Hospital, and Ms. Lanza of the Gretna Police Department each testified that D.M. reported these events to them.
Defendant maintains that D.M.’s version of events differed every time she told her story. First, defendant contends that despite D.M.’s testimony that he wrote down his phone number for her and that she threw it in the trash, defendant maintains he cannot read and write. He further notes that the police searched the trash and never found this paper with the phone number. Second, defendant points out that although D.M. said defendant gave her $100.00 after the incident, no money was ever found or turned over to the police. Third, defendant notes that D.M. stated defendant brought the McDonald’s before the rape, yet she also said defendant brought the food after the incident. Fourth, defendant asserts that in |12some *128 versions D.M. said she took a bath, but in other versions, she told doctors she had not bathed since the incident and was wearing the same underwear and clothes. Fifth, defendant notes that in some versions, D.M. said defendant followed her into the bathroom and tried to force her to take a bath, but in other versions, D.M. said she just wiped herself off afterwards. Lastly, defendant contends that there were discrepancies concerning the number of children in the house that night.
With respect to the phone number, despite the inconsistent testimony regarding whether it was written down and whether D.M. threw it in the trash, Deputy Monson was able to confirm that the number D.M. gave to him was in fact defendant’s phone number. On account of this, a reasonable jury could find that defendant gave his phone number to D.M.
As to the McDonald’s food, although it is not clear as to precisely when defendant brought it home, there was testimony from several witnesses that defendant brought McDonald’s to the house that night. This testimony placed defendant in the home with the victim on the night in question.
The various other inconsistencies among D.M.’s statements, which concern matters tangential to the act of rape or sexual contact, a reasonable jury could find were due to the victim’s young age and the traumatic experience she had endured. Indeed, as Ms. Calogero testified, it is not uncommon for a child victim of sexual abuse to disclose more details as time passes. Nevertheless, while D.M. may have been inconsistent in some details surrounding that night and the incident, her descriptions of the pertinent events— namely, the inappropriate touching and penile-vaginal penetration — were consistent. Further, a review of the transcript reflects that defense counsel cross-examined D.M. regarding many of the alleged inconsistencies and, therefore, the jury was able to consider them when evaluating the credibility of witnesses.
11sAlthough physical evidence was lacking in this case, the testimony of the victim alone is sufficient to support a conviction. Dixon, supra. After hearing testimony from all the witnesses, including the victim, and considering all the evidence, the jury evidently believed D.M.’s version of events and rejected defendant’s, finding him guilty of attempted forcible rape and indecent behavior with a juvenile. Based on the record before us, we see no reason to disturb the jury’s findings.
Therefore, viewing the evidence in the light most favorable to the prosecution, we find that a rational trier of fact would have found defendant guilty of forcible rape and indecent behavior with a juvenile. Accordingly, we also find that the trial court did not abuse its discretion in denying defendant’s motion for new trial on the ground that the evidence was insufficient to support the verdict.[6] These arguments are without merit.
In defendant’s second counseled assignment of error, he argues that the trial court erred in instructing the jury on flight; and in his pro se assignment of error, he argues that the trial court erred in denying his motion for new trial on the ground that the flight instruction was not warranted.
Defendant contends that it was erroneous to instruct the jury on flight because there was no evidence of flight. The State, in support of its request for the flight instruction, argued that defendant’s failure to meet with police after he had *129 learned of their attempts to contact him constituted flight. Defendant responded that his failure to meet with the police was not because he fled, but because he was advised not to by counsel. Namely, at the time defendant was a suspect in this case, he was also under investigation on federal drug charges. Defendant claimed that counsel who was representing him in that investigation advised him not to [14speak with the police.
The evidence established that after defendant failed to respond to the police’s repeated attempts to contact him, a warrant for his arrest was obtained on May 13, 2009, and he was arrested on June 9, 2009. Defendant’s wife testified that during the month-and-a-half between the incident and defendant’s arrest, she and defendant talked about the rape allegations nearly every day and she encouraged him to meet with the police. However, he never did so.
Based on this, the trial court found an instruction on flight was warranted, and instructed the jury as follows:
If you find that the defendant fled immediately after a crime was committed or after he was accused of a crime, the flight alone is not sufficient to prove that the defendant is guilty. However, flight may be considered along with all other evidence. You must decide whether such flight was due to consciousness of guilt or to other reasons unrelated to guilt.
After the jury returned its verdict, defendant filed motions for new trial and post-verdict judgment of acquittal, though copies of these motions are not included in the record. Nevertheless, at the hearing on these motions, defense counsel re-urged the argument that the flight instruction was improper because there was no evidence of flight. The defense called Martin Regan to the stand, who testified that he was representing defendant in April of 2009 regarding a “federal matter” when he learned on May 15, 2009 that there was an arrest warrant for defendant in this case. Mr. Regan agreed to represent defendant in both cases, and advised him not to speak with the police without the presence of counsel.
Mr. Regan further testified that if his clients have a warrant outstanding for their arrest, it is his general practice to advise them that they have a duty to turn themselves in, and that they should do so as soon as possible, with his assistance. Although Mr. Regan became aware of the warrant for defendant’s arrest in this case on May 15, 2009, defendant did not turn himself in and was arrested nearly a |lsmonth later on June 9, 2009.
LSA-C.Cr.P. art. 802 mandates that the trial court instruct the jury on the law applicable to each case. State v. Cornejo-Garcia, 11-619, p. 6 (La.App. 5 Cir. 1/24/12), 90 So.3d 458, 462. This Court has held that if there is testimony of flight after the crime was committed and the jury charge regarding flight is brief when considered in connection with the remainder of the charges, the instruction is neither erroneous nor prejudicial. State v. Smith, 03-786, p. 11 (La.App. 5 Cir. 12/30/03), 864 So.2d 811, 820, writs denied, 04-0380 (La.6/25/04), 876 So.2d 830 and 04-0419 (La.6/25/04), 876 So.2d 830.
For instance, in State v. Emerson, 31,-408, pp. 8-9 (La.App. 2 Cir. 12/9/98), 722 So.2d 373, 378, writ denied, 99-1518 (La.10/15/99), 748 So.2d 470, the second circuit found the jury instruction on flight was proper despite the defendant’s argument that there was no evidence of flight. The evidence adduced at trial indicated that the police investigated the offense shortly after its occurrence and developed the defendant as a suspect. Id., 31,408 at 8, 722 So.2d at 378. The defendant was *130 not present when the police arrived on the scene, police units had not chased him, and attempts to find him were unsuccessful after an arrest warrant had been obtained. Id. The defendant was eventually apprehended seven months later in another state. Id. The second circuit found that the instruction on flight was proper under these circumstances, noting there is no requirement that a subject’s departure from the scene of an offense coincide with police pursuit in order to constitute flight. Id., 31,408 at 8-9, 722 So.2d at 378.
In the instant case, we find that the trial judge did not err in giving the flight instruction. Defendant’s wife testified that defendant knew he was wanted in connection with the rape and that she encouraged him to speak with the police. Defendant’s former counsel, Mr. Regan, also testified that he generally advises his clients to turn themselves in when a warrant is issued for their arrest. Despite | ^defendant’s knowledge of the allegations against him and the encouragement from his wife and counsel to turn himself in, defendant refused to do so. This refusal indicated an intent to conceal himself from authorities and to avoid apprehension. Additionally, we note that the flight instruction was brief: it was three sentences amongst fifteen pages of jury instructions.
In consideration of the foregoing, we find the trial court did not err by instructing the jury on flight. Accordingly, we also find that the trial court did not abuse its discretion in denying defendant’s motion for new trial on this ground. These arguments are without merit.
Nevertheless, even if it was an error to include this flight instruction, such error is subject to a harmless error review. Smith, 03-786 at 11, 864 So.2d at 820. An error is harmless if the guilty verdict actually rendered in the instant trial was surely unattributable to the error. Id. In light of the victim’s positive identification of defendant as the perpetrator, as well as the supporting testimony from several other witnesses, we find that even if the trial court erred by giving the flight instruction, such error was harmless.
Lastly, defendant also argues in his pro se assignment that the trial court erred in denying his motion for new trial on the ground that his right to a fair trial was violated when the State presented perjured evidence in support of the flight instruction. Defendant contends that the State’s allegation that he fled was false, and, therefore, amounted to perjury.
We first note that the record discloses no contemporaneous objection to this alleged prosecutorial misconduct. The contemporaneous objection rule provides that an irregularity or error cannot be availed of after verdict unless it was objected to at the time of its occurrence. State v. Carter, 10-973, p. 10 (La.App. 5 Cir. 8/30/11), 75 So.3d 1, 6, writ denied, 11-2060 (La.2/10/12), 80 So.3d 469. This rule applies to claims of prosecutorial misconduct. Id. Accordingly, defendant has | t7waived any error based on this claim by his failure to lodge a contemporaneous objection.
In any event, the State’s allegation that defendant fled was made during argument pursuant to a request for a jury instruction on flight. Thus, there was no basis to claim prosecutorial misconduct when the allegation was simply an argument that defendant did not contact police because he sought to avoid apprehension. As such, if this issue were before us, we would find that the trial court did not abuse its discretion in denying defendant’s motion for new trial on this ground. This argument is without merit.

*131
Errors Patent

We have reviewed the record for errors patent, according to LSA-C.Cr.P. art. 920, and have found none requiring corrective action.

Decree

For the foregoing reasons, defendant’s convictions are affirmed.

AFFIRMED

. LSA-R.S. 15:529.1 does not prohibit enhancing multiple sentences obtained on the same date arising out of a single criminal act or episode. State v. Shaw, 06-2467, p. 20 (La. 11/27/07), 969 So.2d 1233, 1245.

. The victim’s initials, as well as the initials of the victim's family members, are used under the authority of LSA-R.S. 46:1844(W)(3), which allows the Court to identify a crime victim who is a minor, or a victim of a sex *123 offense, by using his or her initials. The bill of information indicates D.M.’s date of birth is December 15, 1995.

. The bill of information indicates defendant's date of birth is December 22, 1978. Thus, at the time of the offenses, defendant was thirty years old.

. It is noted that although D.M. refers to T.C. as her “father," in fact, he is neither her father nor her stepfather. At the time of the offenses, T.C. was living with D.M.'s mother, with whom he had one child.

. It is well-settled that the law in effect at the time of the commission of the offense is determinative of the penalty which the convicted accused must suffer. State v. Sugasti, 01-3407, p. 4 (La.6/21/02), 820 So.2d 518, 520.

. The trial court’s ruling on a motion for a new trial will not be disturbed on appeal absent a clear showing of an abuse of discretion. Bazley, 09-358 at 17, 60 So.3d at 19.