JOHNSON, J.
11 Defendant, Brandon Michel Moore, appeals his conviction and sentence for attempted forcible rape from the 24th Judicial District Court, Division “B”. For the following reasons, we affirm Defendant’s conviction and remand the matter with instructions.
FACTS AND PROCEDURAL HISTORY
On August 26, 2013, the Jefferson Parish District Attorney charged Defendant with forcible rape of a known juvenile in violation of La. R.S. 14:42.1. On August 28, 2013, Defendant entered a plea of not guilty at his arraignment. Prior to trial, the State filed notices of intent to introduce evidence of similar crimes pursuant to La. C.E. art. 412.2, which were heard and granted by the trial court on November 18, 2013, and April 4, 2014. Trial commenced on April 22, 2014 before a 12-person jury.
At trial, J.J. testified.[1] Before Hurricane Isaac struck, in late August of 2012, J.J., Defendant, and J.J.’s children—H.J. and B.M.—lived on East Hermes in New laOrleans.[2] According to J.J., H.J. had known Defendant since she was one and one-half years old, and she and Defendant were very close.
When J.J. and Defendant got into an argument during August of 2012, Defendant moved out of the residence at East Hermes and began living with Nadia Moore, his son’s mother, in an apartment on Ute Drive on the westbank of Jefferson Parish. At the end of August 2012, Hurricane Isaac struck and Defendant evacuated with H.J., B.M., Nadia, and her children to his mother’s house in Texas. J.J. allowed Defendant to take H.J. and B.M. and stayed behind, since she and Defendant “weren’t seeing eye to eye.”
When Defendant, Nadia, and the children returned to the New Orleans area three or four days later, they went to stay at Nadia’s house on Ute Street because J.J. was due to have surgery during early September and there was still no electricity in New Orleans East. After living with Nadia, Defendant and the children returned home to East Hermes the first week of October 2012.[3] J.J. noticed that *956 from August of 2012 until February of 2013, H.J. was withdrawn and stayed in her room. She said that H.J.’s grades dropped and the way she dressed had changed.
At trial, H.J., the victim, testified that she had known Defendant her entire life and thought of him as a father figure.[4] H.J. state that Defendant began to act differently towards her sometime before Hurricane Isaac hit. She described one incident “in the east” where she was unaware that Defendant was watching her dance in the computer room. Afterwards, he alluded that she knew how to have sex. Around the time of Hurricane Isaac, H.J., who was 13 years old, had a boyfriend, N.R., who lived in Gretna. Defendant and H.J. spoke of her feelings for [aN.R.[5] Defendant told H.J. that she “was ripe” and “ready” to start having sex. He drove N.R.’s house to have sex with him, and after H.J. and N.R. had sex, Defendant asked her how it felt.
H.J. testified that one evening a couple of weeks after she had sex with N.R., and while still living at Nadia’s house on the westbank, Defendant called her into the room he shared with Nadia and exposed himself. H.J. left the room but returned when Defendant called her back. H.J. described that Defendant rose out of a chair as he told her that he knew that she and her boyfriend had sex, and he pushed H.J. on the bed. H.J. testified that Defendant held her hands above her head as she squirmed to get him off. Defendant told H.J.: “Come on, you gave him some, why you can’t give me none.” He then pulled H.J.’s shorts to the side and put his exposed penis inside her vagina. H.J. attempted to squeeze her legs closed, tried to fight back, and kept telling Defendant to get off of her. Defendant eventually got off of H.J., insulted her, and told her to get out.[6]
H.J. described another incident that occurred after she had moved back to East Hermes when Defendant came into her room while she had the lights off and felt her vagina under her clothes. She testified that Defendant inserted his penis inside her anus. She also recalled the time when Defendant asked her for a hug, he reached in her shirt and put his mouth on her breast under her clothes. Defendant told H.J. that if she told anyone he would kill himself. H.J. testified that she loved Defendant, did not want him to kill himself, and was scared. She did not tell anyone what happened for a while, but eventually she told Mr. Armón Dauphin, a social worker at McMain.[7] However, she did not tell Mr. Dauphin everything.
Around January or February of 2013, J.J. decided to speak with H.J. “about |4the birds and the bees,” after learning a friend’s 15-year-old niece was pregnant. J.J. questioned H.J. about whether she was “talking to boys,” as J.J. had told her not to. J.J. described that during this discussion, Defendant, who usually acted as a *957 father figure, retrieved a gun out of a closet and stated that he could shoot someone from 40 yards. H.J., who was crying, admitted to her mother that she had been talking to boys, and J.J. told H.J. she was going to take her to the doctor to see if she had been penetrated. H.J. was worried that her mother would find out about Defendant and her boyfriend, so she told J.J. that she wanted to take a ride with her to get something to eat. Before H.J. left, she told Defendant that she was going to tell her mother what happened, and Defendant told her she was going to have to lie.
During the ride, J.J. described that H.J. began crying so hard that she asked her' if she was pregnant. Concerned, J.J. told H.J to “just let it out ... You won’t be the first, you won’t be the last.” H.J told her mother that Defendant “had brought her by Nadia” and “brought her by a boy named [N.R.].”
After a few hours, J.J. and H.J. returned to the house but did not say anything. Later that evening, J.J. confronted Defendant and asked him where he had brought H.J. and what he did to her. J.J. stated that Defendant tried to console her as she was distraught. When J.J. woke up later, Defendant had taken the guns and left the house. On Monday morning, J.J. saw that Defendant had dropped off the car with his phone in it. J.J. called the police at four o’clock on Monday morning.
Officer Toka Clark with the New Orleans Police Department (“N.O.P.D.”) 7th District testified that, on February 25, 2013, she responded to a call of a possible sexual assault on East Hermes. On the scene, Officer Clark spoke with J.J. and H.J., and Defendant kept calling J.J. At first, Officer Clark instructed J.J. not to answer, but when he continued to call and J.J. was upset, Officer Clark told Rher to answer it. While Defendant and J.J. were on the phone, J.J. asked Officer Clark to follow her into her vehicle where she put Defendant on speaker. Officer Clark was able to hear Defendant apologizing to J.J. for touching his stepdaughter inappropriately but that it was only once and for taking her to her boyfriend’s house to have sex. Officer Clark subsequently notified the child abuse unit.
Detective Akron Davis, who was with the N.O.P.D. child abuse unit on February 25, 2013, was dispatched to East Hermes. Upon arrival, Detective Davis spoke with J.J., who informed him of H.J.’s allegation that she was sexually assaulted by her stepfather, who he learned was Defendant. Detective Davis referred H.J. to the Audrey Hepburn Child Advocacy Center at Children’s Hospital (“CAC”) and met J.J. and H.J at the CAC. There, Detective Davis briefed Daniel Dooley, the interviewer, and monitored the recorded interview from a different room.
During the February 25, 2013 forensic interview,[8] H.J. said she was 14 years old and a freshman at McMain High School. She identified Defendant by name and as her stepfather. She detailed that Defendant “messed” with her and described the first incident as on 6928 East Hermes, when Defendant told her that she looked like she knew how to “work” a penis after seeing her dance.
H.J. stated during the interview that Defendant began to frequently touch and feel her inappropriately when she and her sister went to live with another woman in an apartment on the westbank when her mother had surgery. She similarly described that Defendant told her that she *958 was “ripe” and “ready,” and that he took her to have sex with N.R. When Defendant found out H.J. had sex with N.R., he asked her how it felt and why she could not have sex with him, since she had sex with N.R. She elaborated that also while on the west-bank, Defendant |f,pushed her against the bed, and she told him to stop. She recounted that Defendant tried to pull her shorts to the side, took the tip of his penis out, and asked her to let him put the tip in. H.J. said she kept trying to close her legs but said that the tip of Defendant’s penis touched her. When she would not allow him to put the tip in, he called her a “buster.”
She similarly recounted the time when Defendant asked for a hug, and when he reached in, he pulled her shirt down and put his mouth on her breast. Another time, she was riding in the car with Defendant when he reached over and put his finger inside of her vagina. H.J. also described one time “in the east” when she was lying down on her stomach and Defendant came into her room, tried to move her shorts, and put his finger inside her vagina. Defendant advised H.J. that if she had anal sex, her mother would not be able to find out if H.J. went to the doctor.
When asked if anyone ever saw any of this, H.J. described that Defendant tried to “mess with” her friend K.W. one day when her friend was at their house. K.W. told H.J. that she saw Defendant playing with himself when she went into the kitchen. Defendant then asked K.W. if she saw his penis and if she thought it was big. K.W. told H.J. that Defendant asked her what she liked to do and told her not to tell H.J. H.J. thought K.W. told her this sometime in January. H.J. further explained that Defendant called her his “roll dog” and said that if she said anything, he would blow his brains out. She looked at him like a father and did not want to hurt her mother, which put her in a “messed up” position.[9]
Dr. Neha Mehta,[10] the medical director of the CAC, testified that she conducted an interview and a medical examination of H.J. on February 27, 2013.[11] During the interview, H.J. disclosed to Dr. Mehta that she and N.R. had penile |7and/or vaginal intercourse with a condom. As to Defendant, she informed Dr. Mehta that her stepfather had put his finger in her vagina on more than one occasion, and that he had tried once to put the tip of his penis inside her vagina. Dr. Mehta testified that H.J. reported that Defendant had put his finger into her anus and tried to put the tip of his penis into her anus. H.J. disclosed to Dr. Mehta that her stepfather had pulled down her shirt and had oral contact to her breast area. H.J. explained that Defendant had made her “masturbate him,” and that he had shown her pornographic films to which he made lewd comments. Dr. Mehta’s opinion was that H.J. gave a very clear and detailed history of the multiple types of sexual contact that occurred with Defendant.
*959 As to the medical examination, Dr. Meh-ta reported H.J.’s physical examination as normal, which she stated was consistent with the history that H.J. provided and with her physical maturity rating. H.J. reported to Dr. Mehta that she had been menstruating since age eleven, and Dr. Mehta rated H.J.’s genitalia as a four out of a possible range of five on the scale for genital maturity, meaning that the genital area is better able to accommodate touching or penetration without sensitivity or expectation of injury. Dr. Mehta provided that a normal examination does not indicate that sexual abuse did not occur. She explained that children who are victims of sexual abuse often do not have injuries, since many children do not report abuse immediately, giving the skin time to heal. She referenced a study where 36 pregnant teenage females were examined and only two out of the 36 women had findings that suggested penetration to the examiner. Dr. Mehta conducted a test for sexually transmitted diseases on H.J., which H.J, tested positive for gonorrhea, a sexually transmitted infection, but Dr. Mehta denied being able to determine from whom or when she obtained the infection.
Dr. Mehta explained that the majority of children of sexual abuse delay disclosure. Dr. Mehta explained that older children typically delay disclosure | ^because of external factors, such as threats of harm or fear. However, there are also internal reasons, such as feelings of guilt or disgust. In this case, Dr. Mehta described that H.J. had feelings of blame, shame, and guilt, which were indicated by her statements that Defendant told her not to say anything, that he would kill himself, and he did not want to hurt her mother. Dr. Meh-ta also described a process called “grooming,” which consists of those acts or behaviors a person sexually interested in a child will do to facilitate access to the child or make a connection with the child. Dr. Meh-ta testified that a preexisting relationship makes grooming an easier process, which includes when the relationship is with the parent of the child. Dr. Mehta suggested that this can cause conflict and stress for the child, who may not want to create chaos or disruption among loved ones.
Based upon H.J.’s statements during the forensic interview, Detective Davis visited Mr. Armón Dauphin, H. J.’s school counsel- or at McMain, who reported seeing H.J. upon referral by the school nurse for depression. During their second meeting, on December 18, Mr. Dauphin asked H.J. if she had been physically, sexually, or emotionally abused. H.J. reported that something happened but would not go into details. She told Mr. Dauphin that her mom would “blow up” and probably not believe her. Mr. Dauphin testified that H.J. “clammed up at that point.”
Given HJ.’s allegations in Jefferson Parish, Detective Davis called Detective Jean Lincoln in Jefferson Parish and apprised her of the situation. Detective Lincoln reviewed the case file and met with H.J. and J.J., and H.J. consistently disclosed to Detective Lincoln the allegations. Detective Lincoln obtained an arrest warrant for Defendant, who was subsequently arrested.
At trial, Defendant denied bringing H.J. to N.R.’s house to have sex with him and testified that he was shocked when H.J. told him that she had sex. He claimed that he did not tell J.J. because J.J. “would have beat her to death.” He 19denied being home alone with H.J. on Ute Street or sexually abusing H.J. Prior to Defendant’s testimony, the State published a recorded jailhouse call wherein Defendant asked to speak to H.J. and told her he was “sorry for everything.” Defendant testified at trial that he told H.J. he was “sorry for everything” in the call, since he. was incarcerated and was unable to provide for his fami *960 ly.[12] Defendant denied having any sexually transmitted diseases or knowing whether Nadia had any sexually transmitted diseases.
At the conclusion of the trial, on April 24, 2014, the jury returned a verdict of guilty of the responsive verdict of attempted forcible rape. On May 30, 2014, the trial court sentenced Defendant to 15 years at hard labor with the first year to be served without the benefit of parole, probation, or suspension of sentence. On June 9, 2014, Defendant filed a motion to reconsider his sentence on the basis of excessiveness, which was denied on August 26, 2014. On July 2, 2015, Defendant filed a pro se motion to reconsider his sentence, wherein Defendant requested that “the circumstances of this matter [be] reviewed with fairness.” The trial court denied the motion on July 10, 2015.
On August 20, 2015, Defendant filed a uniform application for post-conviction relief, wherein he stated that his defense counsel failed to appeal his conviction and sentence. On August 27, 2015, the trial court dismissed Defendant’s application for post-conviction relief without prejudice and granted Defendant an out-of-time appeal pursuant to State v. Counterman, 475 So.2d 336 (La. 1985). The instant appeal followed.
ASSIGNMENTS OF ERROR[13]
On appeal, Defendant alleges: 1) the evidence was insufficient to support all of tly elements of the offense for attempted forcible rape beyond a reasonable doubt; 2) the trial court erred by allowing highly inflammatory and prejudicial |inother crimes evidence against him; 3) the trial court erred by allowing the late discovery evidence that N.R. was infected with the same sexually transmitted disease that H. J. contracted; 4) he was deprived of fair due process because the trial court erroneously relied upon invalid and false crimes allegedly committed in Orleans Parish; and 5) he received ineffective assistance of counsel.
LAW AND ANALYSIS
Sufficiency of the Evidence
In his counseled and pro se assignment of error, Defendant claims that the evidence was insufficient to support his conviction of attempted forcible rape.[14] Specifically, Defendant challenges the degree of force committed by him upon H.J. and argues that the force employed was so minimum that it did not amount to force or threats of physical violence where H.J. reasonably believed that the resistance would not prevent the contact. He argues that he ceased his actions when H.J. resisted to the slightest. Defendant contends that the evidence of force presented only supports a conviction of sexual battery, instead of attempted forcible rape.[15]
*961 In reviewing the sufficiency of the evidence, an appellate court must determine that the evidence, whether direct or circumstantial, or a mixture of both, viewed in the light most favorable to the prosecution, was sufficient to convince a rational trier of fact that all of the elements of the crime have been proven beyond a reasonable doubt. Jackson v. Virginia, 443 U.S. 307, 99 S.Ct. 2781, 61 L.Ed.2d 560 (1979); State v. Neal, 00-674 (La. 6/29/01); 796 So.2d 649, 657, cert. denied, 535 U.S. 940, 122 S.Ct. 1323, 152 L.Ed.2d 231 (2002); State v. Alexander, 12-194 (La.App. 5 Cir. 5/16/13); 119 So.3d 120, 126, writ denied, 13-1337 (La. 12/6/13); 129 So.3d 529; State v. Mickel, 09-953 (La.App. 5 Cir. 5/11/10); 41 So.3d 532, 534, writ denied, 10-1357 (La. 1/7/11); 52 So.3d 885.
Under the Jackson standard, a review of the record for sufficiency of the evidence does not require the court to ask whether it believes that the evidence at the trial established guilt beyond a reasonable doubt. Alexander, supra; State v. Jones, 08-20 (La.App. 5 Cir. 4/15/08); 985 So.2d 234, 240. Rather, the reviewing court is required to consider the whole record and determine whether any rational trier of fact would have found guilt beyond a reasonable doubt. Id. It is not the function of the appellate court to assess the credibility of the witnesses or reweigh the evidence. State v. McGinnis, 04-1286 (La.App. 5 Cir. 10/6/05); 917 So.2d 471, 481, writ denied, 05-2469 (La. 4/28/06); 927 So.2d 283.
When the trier of fact is confronted by conflicting testimony, the determination of that fact rests solely with that judge or jury, who may accept or reject, in whole or in part, the testimony of any witness. Alexander, 119 So.3d at 126; State v. Bailey, 04-85 (La.App. 5 Cir. 5/26/04); 875 So.2d 949, 955, writ denied, 04-1605 (La. 11/15/04); 887 So.2d 476, cert. denied, 546 U.S. 981, 126 S.Ct. 554, 163 L.Ed.2d 468 (2005). In the absence of internal contradiction or irreconcilable conflicts with physical evidence, the testimony of one witness, if believed by the trier of fact, is sufficient to support a conviction. Alexander, supra at 126; State v. Dixon, 07-915 (La.App. 5 Cir. 3/11/08); 982 So.2d 146, 153-54, writ denied sub nom., State ex rel. Dixon v. State, 08-987 (La. 1/30/09); 999 So.2d 745. Specifically in sex offense cases, the testimony of the victim alone can be sufficient to establish the elements of a sexual offense, even where the State does not introduce medical, scientific, or physical evidence to prove the commission of the offense. Id.
112In the present matter, Defendant was charged with forcible rape but was found guilty of the responsive verdict of attempted forcible rape, in violation of La. R.S. 14:27 and 14:42.1. Defendant argues in his brief that the degree of force he employed against H.J. was too minimal to support his conviction for attempted forcible rape. Defendant avers that he employed only a *962 minimal amount of force to engage in the contact with the victim, and that he stopped when H.J. kept trying to squeeze her legs closed. Thus, he argues that the evidence, when viewed in the light most favorable to the prosecution, was only sufficient for a conviction of sexual battery.
At the time of the offense, La. R.S. 14:42.1(A)(1) defined forcible rape,[16] in pertinent part, as:
[R]ape committed when the anal, oral, or vaginal sexual intercourse is deemed to be without the lawful consent of the victim because it is committed ... [w]hen the victim is prevented from resisting the act by force or threats of physical violence under circumstances where the victim reasonably believes that such resistance would not prevent the rape.
Any sexual penetration, however slight, is sufficient to complete the crime, and emission is not necessary. See La. R.S. 14:41(B). The testimony of the victim can be sufficient to establish sexual penetration, even though there is an absence of scientific evidence of sexual intercourse. State v. Hawkins, 06-739 (La.App. 5 Cir. 9/25/07); 968 So.2d 1082, 1088, writ denied, 07-2272 (La. 4/18/08); 978 So.2d 347.
La. R.S. 14:27(A) and (C) defined attempt as:
Any person who, having a specific intent to commit a crime, does or omits an act for the purpose of and tending directly toward the accomplishing of his object is guilty of an attempt to commit the offense intended; and it shall be immaterial whether, under the circumstances, he would have actually accomplished his purpose.
[[Image here]]
An attempt is a separate but lesser grade of the intended crime; 1TSand any person may be convicted of an attempt to commit a crime, although it appears on the trial that the crime intended or attempted was actually perpetrated by such person in pursuant of such attempt.
To support a conviction for attempted forcible rape, the State must prove that defendant had the specific intent to commit forcible rape and that he did an act for the purpose of, and tending directly toward, the accomplishment of his objective. See La. R.S. 14:27 and 14:42.1. Specific intent need not be proven as a fact but may be inferred from the circumstances and the actions of the defendant. State v. Strickland, 04-843 (La.App. 5 Cir. 3/1/05); 900 So.2d 885, 890, writ denied, 05-820 (La. 6/17/05); 904 So.2d 683.
In State v. Carter, 04-482 (La.App. 5 Cir. 10/26/04); 888 So.2d 928, 934-35, this Court upheld the defendant’s conviction for forcible rape and found the evidence of the element of force was sufficient where the victim, who was 14 years old at the time of the incident, testified at trial that the defendant, an adult who was larger and stronger than her, picked her up out of bed and carried her to his bedroom, despite her verbal protests. She further testified that the defendant pushed her into a reclining position on his bed and pinned both of her hands behind her back. When she tried to free her hands, the defendant gripped them tighter. The victim also testified at trial that the defendant put his penis into her vagina. Id.
Although in Carter, supra, the victim was unable to physically resist the defendant, here, H.J. was able to resist Defendant’s advances eventually. At trial, H.J. recounted one specific incident that oc *963 curred on the westbank after Hurricane Isaac where Defendant exposed himself to her, pushed her down on the bed, held her hands above her head, and put the tip of his penis inside of her. H.J. testified that she squirmed to get him off, kept trying to squeeze her legs closed, and told Defendant to get off of her. Defendant then called her a “buster” and told her to get out. The testimony indicated that H.J. was 14 years old at the time of the incident and had known Defendant for many years as her stepfather. Defendant |14does not argue that prohibited sexual contact occurred but rather contends that he stopped when H.J. resisted. Regardless of whether Defendant eventually stopped perpetrating the rape, H.J. testified at trial that Defendant used force upon her to insert the tip of his penis inside of her vagina.
In State v. Alexander, 14-1619 (La.App. 1 Cir. 9/18/15); 182 So.3d 126, 128-29, writ denied, 15-1912 (La. 1/25/16); 185 So.3d 748, the First Circuit affirmed the defendant’s conviction for attempted forcible rape where the defendant grabbed the victim from behind and wrapped his arms around the victim’s waist and rib area. The victim struggled, pleaded with the defendant to let her go, and resisted but was overpowered. After picking the victim up, slamming her into a chair, and holding her down, the- defendant forced the victim’s legs apart and positioned himself between the victim’s legs. While the defendant tried to pull down one side of the victim’s leggings, her knee “popped,” and she screamed in pain. The defendant released his grip, apologized, and left the house. The First Circuit held that “[a]n offender who has the specific intent to commit a rape by threatening or forcing his victim into submission and who does an act in furtherance of his goal has committed the offense of attempted forcible rape even if his victim successfully repels the threats or force.” Id., at 131.
As to the specific intent element for Defendant’s conviction of attempted forcible rape, we find that H.J.’s testimony established that Defendant had the specific intent to commit forcible rape and that he performed an act for the purpose of, and tending directly toward, the accomplishing of his goal. H.J. testified explicitly to the multiple incidences that occurred with Defendant. As to the incident on the west-bank, H.J. stated that Defendant called her back into the room when she first tried to leave and after the rape occurred, he called her a “buster” and told her to get out.
After review, we find that sufficient evidence was presented as to the 11Battempted forcible rape conviction. Additionally, the State presented evidence of the forcible rape. In Dr. Mehta’s expert opinion, H.J. was able to give a very clear and detailed history of the multiple types of sexual contact that occurred with Defendant. During the CAC interviews, H.J. informed the interviewer and Dr. Mehta that the tip of Defendant’s penis touched her whereas at trial, she testified that Defendant put the tip of his penis inside of her. Jurisprudence reveals that only slight penetration is required for a rape to occur. See La. R.S. 14:41(B). In Strickland, supra, this Court upheld the defendant’s conviction for attempted forcible rape where the victim testified that the defendant only partly inserted his penis into her and was unable to complete the act because her uncle walked into the room. Id., at 888-89. Therefore, despite any inconsistencies, a reasonable jury could have found that the State proved the element of penile-vaginal penetration solely based on H.J.’s testimony at trial. See Alexander, supra; Dixon, supra.
*964 Accordingly, we find that a review of the record reveals that the evidence, when viewed in the light most favorable to the prosecution, was sufficient for a rational trier of fact to have found Defendant guilty of forcible rape and to support his conviction of the responsive verdict of attempted forcible rape under the Jackson standard.
Other Crimes Evidence
In his pro se assignments, Defendant argues that the State’s introduction of “hearsay evidence of ‘aggravated incest’ [H.J.] and ‘sexual batter/ [K.W.] in which defendant was never booked for in Orleans Parish” was a violation of due process and was not introduced as evidence of any element of the crime of which he was accused but was solely used to show that he was a man of bad character and acted in conformity therewith. He contends briefly, among other things, that the State used prejudicial hearsay evidence from H.J. and “her witness” over the defense’s motion in limine when this “other crimes evidence” was unnecessary to | ^prove the charged offense. He does not specifically describe the contents of this “hearsay evidence.” Defendant admits that his defense counsel failed to object to the trial court’s consideration of this “false other crimes evidence” during the testimony of the State’s witnesses.
Prior to trial, the State filed two notices of intent to introduce other crimes evidence pursuant to La. C.E. art. 412.2. The State’s first notice filed on October 28, 2013, sought to introduce evidence of Defendant’s “lustful disposition” towards H.J. by introducing evidence that a number of sexually assaultive acts were committed upon H.J. in Ox-leans Parish duiing the same time frame as the allegations in the bill of information which charged Defendant with forcible rape.[17] The State alleged that it filed the notice in an abundance of caution as it believed that the evidence was admissible as res gestae. In its second notice of intent filed on March 17, 2014, the State sought to introduce evidence of Defendant’s “lustful disposition” towards K.W, H.J.’s friend, pursuant to La. C.E. art. 412.2. With this second notice of intent, the State additionally filed a motion to seal a disc containing a New Orleans Police Department interview of K.W. Defense counsel filed motions in limine to prohibit reference at trial to any pending charges against Defendant in Orleans Parish as to H.J. and to limit any hearsay evidence contained in HJ.’s CAC video.
During the November 18, 2013 hearing pertaining to the alleged incidences in New Oi-leans east with H.J., the State similarly argued, as it did in its motion, that the evidence fell under La. C.E. art 412.2 to prove that Defendant had a “lustful disposition” towards children and, alternatively, that the evidence was res gestae. Defense counsel countered that the prejudicial value of the evidence outweighed its probative effect and indicated that “it’s clear that the State possibly could win this case solely based on the evidence coming out of Jefferson Parish.” |17At the April 4, 2014 hearing regarding Defendant’s alleged sexual abuse of K.W., defense counsel argued that the evidence was based merely off of an arrest and not a conviction and that again, the evidence would be overly prejudicial. The State simply responded that the evidence clearly fell under La. C.E. art. 412.2. At the conclusion of the hearings, the trial court granted the State’s notices to admit the other crimes evidence, to which defense counsel objected.
At trial, HJ.’s CAC video was published for the jury, wherein she described inci- *965 denees that began in New Orleans east with Defendant making inappropriate comments and touching her and the incident on the westbank of Jefferson Parish when Defendant attempted to rape her. She also described in the video that K.W. had told her that Defendant had been inappropriate towards her. The video was admitted and published to the jury without objection by defense counsel.
Generally, to preserve an issue for appeal, a party need not enter a contemporaneous objection to the court’s ruling on a written motion. La. C.Cr.P. art. 841(B). However, where a defendant initially files a pre-trial motion objecting to the introduction of certain evidence, if at trial he specifically agrees to the introduction, he has waived his prior objection and loses the right to present the issue on appeal. State v. McGowan, 16-130 (La.App. 5 Cir. 8/10/16); 199 So.3d 1156, 1161.
Here, we find that, although defense counsel objected during pretrial proceedings, he did not object at trial to the admission of HJ.’s CAC video. At the time the State moved to introduce the CAC video, the trial judge asked defense counsel whether he had any objection, to which he responded, “No objection.” Therefore, we determine this argument was not preserved for our review. Nevertheless, we note that even though the trial court ruled KW.’s interview with the New Orleans Police Department was admissible, it was never played for the jury.
[ ^However, both H.J. and K.W. testified at trial regarding Defendant’s sexual abuse towards them. H.J. described incidences with Defendant that occurred in New Orleans east where he sexually abused and made inappropriate comments to her. Defense counsel did not make any objection during H.J.’s testimony wherein she described the multiple incidences that occurred in Orleans Parish. As to K.W., she testified at trial as to Defendant’s inappropriate comments and actions towards her, which defense counsel also did not object to. Last, the jury did not specifically hear testimony that Defendant had charges pending against him as to H.J. or K.W. in Orleans Parish.
Nonetheless, La. O.E. art. 412.2(A) provides:
When an accused is charged with a crime involving sexually assaultive behavior, or with acts that constitute a sex offense involving a victim who was under the age of seventeen at the time of the offense, evidence of the accused’s commission of another crime, wrong, or act involving sexually assaultive behavior or acts which indicate a lustful disposition toward children may be admissible and may be considered for its bearing on any matter to which it is relevant subject to the balancing test provided in Article 403.
Even independently relevant evidence may be excluded if its probative value is substantially outweighed by the danger of unfair prejudice, confusion of the issues, or misleading the jury, or by considerations of undue delay or waste of time. La. C.E. art. 403. Rulings on the admissibility of evidence will not be disturbed absent an abuse of discretion. State v. Rodgers, 16-14 (La.App. 5 Cir. 10/26/16); 202 So.3d 1189, 1201.
H.J., the victim, described at trial that Defendant began to act inappropriately towards her while they were living in New Orleans east and then subsequently recounted for the jury other incidences that occurred in Jefferson Parish after she temporarily moved with Defendant and her sister to the westbank after Hurricane Isaac. H.J. recounted incidents of Defendant’s abuse toward her that occurred before and after the attempted rape in Jef *966 ferson Parish. Thus, H.J.’s | ^reference to any incident in Orleans Parish could “constitute!!] an integral part of the act or transaction that is the subject of the present proceeding.” See La. C.E. art. 404(B)(1).
Further, as to K.W.’s testimony, K.W. and H.J. were approximately around the same age and were in regular contact with Defendant. They both stated that they saw Defendant as a father figure. Based upon the record, the jury did not confuse the issues and was not misled (as alleged by Defendant), and both H.J. and K.W. were present to testify.[18] Therefore, K,W.’s testimony falls under the parameters of La. C.E. art. 412.2. In sum, the probative value of the other sexual offense evidence was not substantially outweighed by the danger of unfair prejudice. Therefore, we find that the trial judge’s rulings that the other crimes evidence was admissible were not an abuse of discretion.
Disclosure of Evidence
In this pro se assignment of error, Defendant contends that he discovered during trial that the State’s witness, N.R., contracted chlamydia/gonorrhea from H.J. He argues that the State’s failure to timely disclose this favorable evidence was a Brady violation as he could have refuted the alleged rape of H.J. since neither he, J.J., nor Nadia Moore were infected.
In Brady v. Maryland, 373 U.S. 83, 83 S.Ct. 1194, 10 L.Ed.2d 215 (1963), the United States Supreme Court held that the suppression by the State of evidence favorable to the accused after it receives a request for such evidence violates a defendant’s due process rights where the evidence is material to either guilt or punishment, without regard to the good or bad faith of the prosecutors. The duty to disclose applies to both exculpatory and impeachment evidence. United States v. Bagley, 473 U.S. 667, 676, 105 S.Ct. 3375, 3380, 87 L.Ed.2d 481 (1985); State v. Kemp, 00-2228 (La. 10/15/02); 828 So.2d 540, 545. Evidence is “material” under | xfirady only if there is a reasonable probability that the result of the proceeding would have been different if the evidence had been disclosed to the defense. A reasonable probability is one that is sufficient to undermine confidence in the outcome. United States v. Bagley, 473 U.S. at 682, 105 S.Ct. at 3383.
Brady challenges, like the one asserted in Defendant’s pro se brief, present fact-based judgments that cannot be adequately first made on appellate review. United States v. Gonzales, 436 F.3d 560, 580 (5th Cir. 2006), cert. denied, 547 U.S. 1180, 126 S.Ct. 2363, 165 L.Ed.2d 280 (2006). Brady challenges must be brought to the trial court’s attention, winnowed by the trial judge, and made part of the record through a motion for new trial. State v. Sparkman, 13-640 (La.App. 5 Cir. 2/12/14), 136 So.3d 98, 112, writ denied, 14-477 (La. 11/26/14); 152 So.3d 897; United States v. Jones, 112 Fed.Appx. 343, 344 (5th Cir. 2004), cert. denied, 543 U.S. 1174, 125 S.Ct. 1369, 161 L.Ed.2d 156 (2005).
After review, we find that Defendant did not raise this issue at the trial court level. Thus, it has not been preserved for appellate review and will not be addressed. See, Uniform Rules-Courts of Appeal, Rule 1-3.
Ineffective Assistance of Counsel
In this pro se assignment of error, Defendant argues the following grounds as to how his trial counsel was ineffective:
*967 1. Defense counsel did not request a continuance or mistrial to obtain the medical records of N.R. and the victim concerning the dates and persons who treated them for this STD in light of the fact neither defendant Moore, J.J. or Nadia Moore contracted any STD during the periods charged in the Bill of Information in Jefferson or Orleans Parish.
***
2. The trial court did not adequately define what’s the basis of other crimes evidence without objections.
[[Image here]]
3. The trial court did not adequately define the elements of the lesser and included under La. R.S. 14:27/14:42.1;
[[Image here]]
4. (a) The state of Louisiana agreed not to prosecute N.R. who was 17 years old when the victim [H.J.] was 14 years which violated La. R.S. 14:43.1 I ¾1 (sexual battery) to which both the victim [H.J.] and this witnesses [sic] (b) The defense attorney failed to properly investigate this case to which this evidence may have been obtained through the district attorney* office as the individual witnesses who was known by counsel and used for impeachment purposes;
[[Image here]]
5. Defense counsel failed to preserve these claims pursuant to La. C.Cr.P. art. 841 for appellate purposes; and
[[Image here]]
6. Appoint another counsel to perfect these claims.
Under the Sixth Amendment to the United States Constitution and Article 1, § 13 of the Louisiana Constitution, a defendant is entitled to effective assistance of counsel. State v. Griffin, 14-450 (La.App. 5 Cir. 12/16/14); 167 So.3d 31, 48, writ denied, 15-148 (La. 11/12/15); 180 So.3d 315. A claim of ineffective assistance of counsel must satisfy the two-prong test set forth in Strickland v. Washington, 466 U.S. 668, 104 S.Ct. 2052, 80 L.Ed.2d 674 (1984); State v. Ott, 12-111 (La.App. 5 Cir. 10/16/12); 102 So.3d 944, 953.
Under the Strickland test, the defendant must show: (1) that counsel’s performance was deficient, that is, that the performance fell below an objective standard of reasonableness under prevailing professional norms; and (2) that the deficient performance prejudiced the defense. Ott, supra. This requires showing that counsel’s errors were so serious as to deprive the defendant of a trial whose result is reliable. Id. The defendant must show that there is a reasonable probability that, but for counsel’s unprofessional errors, the result of the proceeding would have been different. Id. A reasonable probability is a probability sufficient to undermine confidence in the outcome. Id.
A court must indulge a strong presumption that counsel’s conduct falls within the wide range of reasonable professional assistance. Griffin, supra; Ott, supra. Therefore, the defendant must overcome the presumption that, under the circumstances, the challenged action “might be considered sound trial strategy.” Strickland, supra. There is no precise definition of reasonably effective assistance haof counsel. Accordingly, any inquiry into the effectiveness of counsel must be specific to the facts of the case and must take into consideration the counsel’s perspective at the time. Id. The Sixth Amendment does not guarantee errorless counsel or counsel judged ineffective by hindsight. Id.
A claim for ineffective assistance of counsel is most appropriately addressed through an application for post-conviction relief filed in the trial court, where a full *968 evidentiary hearing can be conducted, rather than on direct appeal. Griffin, supra; State v. Washington, 03-1135 (La. App. 5 Cir. 1/27/04); 866 So.2d 973, 983. However, when the record contains sufficient evidence to rule on the merits of the claim and the issue is properly raised by assignment of error on appeal, it may be addressed in the interest of judicial economy. State v. Deruise, 98-0541 (La. 4/3/01); 802 So.2d 1224, 1248, cert. denied, 534 U.S. 926, 122 S.Ct. 283, 151 L.Ed.2d 208 (2001).
After review, we find that the record contains sufficient evidence to rule on the merits of Defendant’s claims. As to Defendant’s arguments regarding trial counsel’s failure to file a continuance or mistrial, as previously noted no objection was lodged during the testimony of N.R. nor was it concretely established that Defendant did not have a sexually transmitted disease. Defendant has made no showing as to the possible merit of a motion for continuance or mistrial other than his mere assertion that trial counsel failed to file one. As to the failure to investigate, his allegations are conclusory and lack specificity. We find that Defendant has not demonstrated that, but for counsel’s alleged unprofessional conduct, the outcome of the trial would have been different. See State v. Seals, 09-1089 (La.App. 5 Cir. 12/29/11); 83 So.3d 285, 328-29, writ denied, 12-293 (La. 10/26/12); 99 So.3d 53, cert. denied, — U.S. -, 133 S.Ct. 2796, 186 L.Ed.2d 863 (2013).
As to sub-assignments two and five, a defense attorney’s examination of laawitnesses falls within the ambit of trial strategy for the purposes of evaluating an ineffectiveness claim. State v. Williams, 98-1146 (La.App. 5 Cir. 6/1/99); 738 So.2d 640, 652, writ denied, 99-1984 (La. 1/7/00); 752 So.2d 176. Defendant does not specifically assert what objection he believes should have been lodged or what claims trial counsel should have preserved pursuant to La. C.Cr.P. art. 841. The record indicates that defense counsel effectively questioned witnesses, and Defendant fails to show that counsel had any reason to lodge an objection and failed to do so. The time and manner of making objections is part of the trial strategy decision-making of the trial attorney. State v. Hoffman, 98-3118 (La. 4/11/00); 768 So.2d 542, 578, cert. denied, 531 U.S. 946, 121 S.Ct. 345, 148 L.Ed.2d 277 (2000).
As to sub-assignments three and 4(a), wherein Defendant argues that the trial court failed to define the elements of the offenses and that the State failed to prosecute N.R. for sexual battery, we find that these claims in no way pertain to trial counsel’s performance and are, thus, mer-itless when considering Defendant’s ineffective assistance of counsel claims. Last, we find that Defendant has made no concise argument as to why another counsel should have been appointed to him. Therefore, under Strickland, supra, we determine that Defendant has failed to show that counsel’s performance was deficient and that he was prejudiced.
Errors Patent Review
The record was reviewed for errors patent, according to La. C.Cr.P. art. 920; State v. Oliveaux, 312 So.2d 337 (La. 1975); and State v. Weiland, 556 So.2d 175 (La. App. 5th Cir. 1990), and reveals an error patent that requires corrective action.
At the time of the offense, forcible rape was punishable by imprisonment at hard labor for not less than five years nor more than 40 years. The statute further provided that at least two years of the sentence imposed be without benefit of probation, parole, or suspension of sentence. See La. R.S. 14:42.1(B). The record *969 I ^indicates that the trial court imposed an illegal sentence by imposing restrictions for only one year when the statute required that at least two years of the sentence be served without benefit of parole, probation, or suspension of sentence.
The attempt statute provides, in pertinent part, that a defendant should be fined or imprisoned or both, in the same manner as for the offense attempted, and that the fine or term of imprisonment should not exceed one-half of the largest fine, or one-half of the longest term of imprisonment prescribed for the offense so attempted, or both. See La. R.S. 14:27(D)(3). (See also State v. Singleton, 10-1130 (La.App. 1 Cir. 2/11/11); 57 So.3d 611 n.1 (not designated for publication), where the First Circuit mentioned that the trial judge was required to impose at least two years of the attempted forcible rape sentence without benefit of probation, parole, or suspension of sentence under La. R.S. 14:42.1(B) and La. R.S. 14:27(D)(3).)
Therefore, we remand this matter for resentencing in compliance with the benefits provisions under La. R.S. 14:42.1 and La. R.S. 14:27.
DECREE
For the foregoing reasons, we affirm the conviction of Brandon Michel Moore and remand the matter to the trial court for resentencing pursuant to the benefits provisions under La. R.S. 14:42.1 and La. R.S. 14:27.
CONVICTION AFFIRMED; REMANDED FOR RESENTENCING

. To observe the principle of protecting minor victims and victims of sexual offenses set forth in La. R.S. 46:1844(W)(3), the victim and any witness whose name can lead to the victim’s identity, z.e., parent, sibling, or relative with the same last name as the victim, will be identified by initials only.

. J J. and Defendant have been married since September 20, 2005. J.J, identified Defendant in court and referred to him as her husband.

. The testimony was inconsistent as to how long Defendant and the children stayed at Nadia's house. Defendant testified that they stayed there for one and one-half to two months or longer. Nadia testified that the children stayed there for two or three weeks, *956 and Defendant stayed there during the month of September. At trial, H.J. remembered they returned home to East Hermes during early October since they were back before her birthday on October 11th.

. H.J. identified Defendant in court.

. N.R. denied that he and H.J. ever dated but said that they only had a sexual relationship. He testified that the second time he and H.J. had sex, he did not use a condom. Three days later, he began "burning” and learned that he had a sexually transmitted infection. He could not recall whether he had chlamydia or gonorrhea.

. At trial, H.J, could not remember the exact date of this incident. However, she stated that it was after her sister’s birthday, which was September 23rd.

, Mr. Dauphin later testified that "McMain” is Eleanor McMain High School.

. Daniel Dooley, a forensic interviewer with the CAC, conducted the interview with H.J. on February 25, 2013. He authenticated that the DVD recording was a fair and accurate representation of the interview with H.J. made on that date.

.At trial, K.W, testified that she has known H.J. since fourth grade and has known Defendant just as long. K.W. described another incident with Defendant where he drove H.J. and K.W. to a party. Once they arrived, H.J, exited the vehicle and while Defendant and K.W. were alone, he pulled his penis out and asked her to "ride it.” K.W. said she stopped going to H.J.’s house after that because K.W. saw Defendant as a father figure.

. Dr. Mehta was qualified as an expert in child abuse pediatrics.

. The CAC medical records and transcript of the interview conducted by Dr. Mehta, and to which she testified, were admitted into evidence.

. The recorded jailhouse calls were admitted into evidence. Only a portion of the calls was published to the jury.

. Assignments of error numbers one and four will be discussed jointly because they are related arguments.

. Defendant failed to file a motion for post-verdict judgment of acquittal, challenging the sufficiency of the evidence pursuant to La. C.Cr.P. art. 821. However, such failure does not preclude appellate review of the sufficiency of the evidence. See State v. Allen, 440 So.2d 1330 (La. 1983); State v. Washington, 421 So.2d 887 (La. 1982); State v. Brown, 01-41 (La.App. 5 Cir. 5/30/01); 788 So.2d 694, 699 n.6; State v. Girod, 94-853 (La. App. 5 Cir. 1995); 653 So.2d 664.

.We note that the April 24, 2014 trial minute entry provides that the jury charges were discussed in chambers and read to the juty without objection. The written jury charges reveal an instruction as to attempted forcible rape, and at the time of the reading of the *961 instructions, the trial judge stated on the record that they were acceptable to both sides, and defense counsel agreed. During deliberations, the jury requested that the charges be read again, which the trial judge complied. Therefore, the record fails to indicate that Defendant lodged any objection to the responsive verdicts, which included attempted forcible rape of which he was convicted. When a defendant does not object to a legislatively responsive verdict, the defendant’s conviction will not be reversed, whether or not that verdict is supported by the evidence, as long as the evidence is sufficient to support the offense charged. State ex rel. Elaire v. Blackburn, 424 So.2d 246, 252 (La. 1982), cert. denied, 461 U.S. 959, 103 S.Ct. 2432, 77 L.Ed.2d 1318 (1983); Alexander, infra at 127; State v. Austin, 04-993 (La.App. 5 Cir. 3/1/05); 900 So.2d 867, 878, writ denied, 05-0830 (La. 11/28/05); 916 So.2d 143. Thus, we will review the merits of Defendant’s assignment of error.

. Forcible rape is a general intent crime. State v. Smith, 35,699 (La.App. 2 Cir. 4/5/02); 815 So.2d 412, 421, writ denied, 02-1502 (La. 4/4/03); 840 So.2d 1200.

. The State suggested during the hearing on the motion that the first notice of intent pertained to the CAC video of H.J. conducted by Daniel Dooley.

. The record does not include any limiting instruction given by the trial judge to the jury. However, the record reflects that Defendant did not lodge any objection to the trial judge’s jury instructions,