STATE OF LOUISIANA

VERSUS

SYLVESTER HAYMAN

NO. 20-KA-323

FIFTH CIRCUIT

COURT OF APPEAL

STATE OF LOUISIANA


ON APPEAL FROM THE TWENTY-NINTH JUDICIAL DISTRICT COURT
PARISH OF ST. CHARLES, STATE OF LOUISIANA
NO. 18,16, DIVISION "C"
HONORABLE EMILE R. ST. PIERRE, JUDGE PRESIDING


April 28, 2021


**HANS J. LILJEBERG**
**JUDGE**


Panel composed of Judges Marc E. Johnson,
Stephen J. Windhorst, and Hans J. Liljeberg


**CONVICTION AFFIRMED; SENTENCE ON COUNT ONE AFFIRMED;**
**REMANDED FOR RESENTENCING ON COUNT TWO AND FOR**
**CORRECTION OF UCO**
   **HJL**
   **MEJ**
   **SJW**

COUNSEL FOR PLAINTIFF/APPELLEE,
STATE OF LOUISIANA
Joel T. Chaisson, II
Louis G. Authement

COUNSEL FOR DEFENDANT/APPELLANT,
SYLVESTER HAYMAN
Gwendolyn K. Brown

**LILJEBERG, J.**

Defendant, Sylvester Hayman, appeals his conviction on count two for attempted indecent behavior with a juvenile and his sentences on both count one for indecent behavior with a juvenile and count two for attempted indecent behavior with a juvenile. For the following reasons, we affirm defendant's conviction on count two and his sentence on count one. However, we remand the matter to the trial court for resentencing on count two and for correction of the Uniform Commitment Order.

**PROCEDURAL HISTORY**

On March 27, 2018, the St. Charles Parish District Attorney filed a bill of information charging defendant, Sylvester Hayman, with two counts of molestation of a juvenile in violation of La. R.S. 14:81.2. Defendant was arraigned on the same date and pleaded not guilty. The bill of information was amended on March 11, 2019, to charge defendant with two counts of indecent behavior with a juvenile in violation of La. R.S. 14:81 and to include the birthdates of both victims, E.G. (4/27/09) and A.M. (11/14/11).[1] Defendant was re-arraigned the same day and pleaded not guilty. The bill of information was again amended on June 25, 2019, to remove the phrase "by use of influence by virtue of defendant's care, custody, control and supervision of the juvenile" from the description of both counts as this language pertained only to the original charges of molestation of a juvenile. Defendant was re-arraigned that same date and again pleaded not guilty.

Jury selection began on June 25, 2019, and the twelve-person jury unanimously convicted defendant on June 27, 2019, of indecent behavior with the juvenile, E.G. (count one), and attempted indecent behavior with the juvenile,

---

[1] In the interest of protecting minor victims and victims of sexual offenses as set forth in La. R.S. 46:1844(W)(3), the judges of this Court have adopted a policy that this Court's published work will use only initials to identify the victim and any defendant or witness whose name can lead to the victim's identity (i.e., parent, sibling, or relative with the same last name as the victim). *State v. E.J.M., III,* 12-774, 12-732 (La. App. 5 Cir. 5/23/13), 119 So.3d 648. In this case, A.M. and E.G are minor victims of a sexual offense and were juveniles at the time they testified at trial.

A.M. (count two). The trial court requested a pre-sentence investigation prior to sentencing. Defendant then filed motions for new trial and for post-verdict judgment of acquittal on July 9, 2019. The trial court heard and denied these motions on July 16, 2019. On October 1, 2019, the trial court sentenced defendant on count one to twenty years of imprisonment in the Department of Corrections with two years to be served without the benefit of parole, probation, or suspension of sentence. As to count two, the trial court sentenced defendant to ten years of imprisonment in the Department of Corrections with one year to be served without the benefit of parole, probation, or suspension of sentence. The trial court ordered the sentences to run consecutively, and also ordered defendant to register as a sex offender for fifteen years upon his release from custody.

Defendant filed a motion to reconsider sentences on October 29, 2019. On November 14, 2019, the trial court heard and denied the motion. The next day, defendant filed a motion for appeal, which was granted on November 25, 2019. On appeal, defendant challenges the sufficiency of the evidence presented on count two, as well as the trial court's denial of his motions for new trial and for post-verdict judgment of acquittal as to that count. Defendant also challenges his sentences as excessive, as well as the trial court's denial of his motion to reconsider his sentences.

**FACTS**

At trial, Deputy Emory Putman testified that on November 26, 2017, he and Deputy Adam Coley were dispatched to 452 Killona Drive in Killona, Louisiana, regarding a dispute between two family members, K.A.[2] and defendant. Deputy Putman testified that K.A. was located outside of the home when they arrived. K.A. explained to the deputies that when she arrived at the residence, she had an

---

[2] K.A. is referred to as an aunt throughout the record. K.A. is actually the children's great-aunt as she is their grandmother's sister. The children's grandmother, T.B., was the longtime girlfriend and later, wife of defendant.

altercation with defendant regarding allegations of sexual abuse by defendant involving two children located inside of the residence — E.G. (8 years old) and A.M. (6 years old). The residence located at 452 Killona was owned by the children's great-grandmother, E.B., and at that time, the children lived there with her and their two other siblings, as well their grandmother, T.B., and defendant, who was her longtime boyfriend at the time.[3]

Deputy Putman testified that he entered the home and he spoke to the children in a separate area away from the adults. However, there was no door and the grandmother, T.B., repeatedly interrupted. Deputy Putman testified that he first spoke with D.D., the brother of E.G. and A.M.[4] Deputy Putman explained that D.D. appeared upset, concerned, and "nervous about saying what he had to say." The State played portions of the video and audio recorded at the scene by the deputy's police unit, which included audio of the deputies' conversation with D.D. D.D. explained how he and his sisters spent time at his aunt K.A.'s house over Thanksgiving. He explained that during their visit, A.M. told another girl, Mariah, about alleged sexual abuse by defendant, who the children referred to as "Grandpa Sy." When the deputy attempted to question A.M. about what happened with Grandpa Sy, she became emotional, started crying, and hugged herself.

After these discussions, the deputy requested that a juvenile detective come to the scene. Deputy Putman indicated that Detective Jennifer Williams later arrived. Neither defendant nor K.A. were arrested at that time in connection with the disturbance that originally brought him to the scene nor with the sex abuse allegations raised against defendant.

---

[3] The children's mother, A.D., testified that she was unable to care for her children at that time. According to testimony, E.G. spent half of the time with her father, but A.M. was primarily in the custody of T.B. and defendant at that time.

[4] Initials are used to protect the identity of juveniles at the time of trial who testified as witnesses for the State in this case. *See State v. Rodas*, 15-792 (La. App. 5 Cir. 9/22/16), 202 So.3d 518, 521 n.2, *writ denied*, 16-1881 (La. 9/6/17), 224 So.3d 980.

Deputy Coley with the St. Charles Parish Sheriff's Office also testified that he was dispatched to 452 Killona Drive on November 26, 2017. He testified that he learned K.A. was at the residence because she brought the children back home after spending time at her home in Covington, Louisiana. K.A. explained that she was upset when she saw defendant at the residence and confronted him about the sexual abuse allegations the children reported to her. Deputy Coley testified that K.A. indicated she was angry with defendant because she believed he was a child molester.

Deputy Coley also entered the home to speak with the children. He described D.D. as guarded and uncomfortable. When they asked D.D. about the allegations the girls made against defendant, Deputy Coley explained that D.D. made a hand gesture. D.D. said the girls made this same hand gesture at K.A.'s house. When asked to demonstrate the hand gesture made by D.D. at trial, Deputy Coley made a circle with one hand and inserted his pointer finger from his other hand through the circle. Deputy Coley testified that when he asked A.M. what happened with "Grand Daddy Sy," she bent over, dropped her head, and began crying.

Former Detective Jennifer Williams testified that she retired from the juvenile division of the St. Charles Parish Sheriff's Office in April 2018. She was also called to 452 Killona Drive on November 26, 2017, concerning a disturbance and an allegation regarding children. Ms. Williams stated that upon her arrival, Deputy Coley explained the situation to her. She did not attempt to speak to the children at the scene. Rather, she instructed K.A. to remove the children from the home and bring them to the juvenile division the next day. She further testified that she did not arrest defendant that night.

Ms. Williams stated that K.A. brought the children to meet her the next day. Ms. Williams and Detective Holly Laurent took recorded statements from the

children's great-aunt, K.A., the children's grandmother, T.B., D.D., A.M., and E.G., who is D.D. and A.M.'s sister. According to Detective Laurent, D.D. explained that he told his aunt, K.A., about a conversation his sisters and a friend of the family named Mariah had about something that happened with Grandpa Sy. D.D. did not provide any further details regarding the conversation.

During her interview with E.G., Detective Laurent found E.G. was withdrawn. E.G. shut down and did not want to talk once they began discussing why she was there. E.G. told Detective Laurent that her brother and Mariah told her aunt something, but she did not know what. E.G. also told her that when she asked her sister why she always went with Grandpa Sy, her sister responded, "'[w]ell if I don't, he's going to kill me.'" Detective Laurent testified that she then asked E.G. if she "hung out" with defendant, and E.G. replied that she did not. Detective Laurent asked E.G. why not and testified that E.G. "immediately shut down. She tried to speak. She would speak a couple of words. She started saying, '[w]ell when I was five, six, and seven,' and then she kind of paused a little bit, and then she said, 'there was a white trailer.' She paused for a little bit, and then she said, '[y]ou know, I want to tell you. I just can't say the word.'" Detective Laurent testified that she then asked E.G. if she could spell the word, and E.G. answered affirmatively. Detective Laurent testified that she "spelled out 'S-E-X'." Detective Laurent then asked E.G. if it was a good or bad thing, and E.G. told her it was bad.

Detective Laurent also asked E.G. if defendant used his hands, and E.G. responded affirmatively. She asked E.G. if defendant used any other body parts, and E.G. again indicated he had. Detective Laurent testified that she asked what body parts were used, but E.G. began crying and would not answer. She also asked E.G. if this happened once or more than once, and E.G. told her it was just one time.

Detective Laurent then spoke to A.M., who was six years old at the time of the interview. Detective Laurent described A.M. as very withdrawn. After asking general questions, Detective Laurent asked her about the conversation she had with her sister and Mariah in the bathtub. She stated that A.M. then shut down, would not answer any more questions, and started crying. Detective Laurent testified that she asked about her sister, and A.M. said that her sister told her that somebody wanted to hurt her. After that, A.M. would not provide any more information. Detective Laurent and Ms. Williams testified that after the interviews, they referred E.G. and A.M. to Children's Hospital for physical exams and forensic interviews.

D.D. testified that he was eleven years old at the time of trial. He indicated that E.G. and A.M. are his little sisters. He recalled going to his aunt K.A.'s house for Thanksgiving in 2017. He stated he, K.A, his two sisters, his brother, and his aunt's co-worker's daughter, Mariah, were all at the house. He testified that "the girls" were in the bathtub talking. D.D. said Mariah then came out and told him "what the girls had said." He then went to his aunt and told her they had something to tell her. He said he went to his aunt because she was the adult in the house and he thought somebody needed to know. He indicated that Mariah and E.G. then told K.A. what was said in the bathtub. D.D. also indicated that both of his sisters and Mariah made the hand gesture he showed to the deputies.

D.D. recalled returning to his grandmother's house in Killona and the police going to the house. He indicated that he spoke to the police and that no one told him what to say. He stated that he, his grandmother, Grandpa Sy, his two sisters, his brother, and his great-grandmother lived at 452 Killona. D.D. testified that the four children stayed in one room together with two beds, while T.B. and Grandpa Sy stayed in a different room right next to the children's room. He noted that his great-grandmother's room was "all the way in the back."

He testified that his grandma, T.B., and Grandpa Sy lived in the white trailer next door for two or three years, and they also previously lived in a beige trailer. He stated he and his three siblings lived in the white trailer, and he thought his sisters lived in the beige trailer, but he did not live there. He testified that he thought his mother, A.D., lived in the white trailer "at one time but not permanently," and his cousin Ashley also lived there. D.D. testified that the white trailer had two bedrooms, so his mother slept on the sofa, and Ashley slept "in the big chair." D.D. indicated that Grandpa Sy woke up early for work when they lived in the white trailer, and the children would all still be sleeping.

He did not remember Grandpa Sy ever taking E.G. or A.M. out of their bed and said he did not see Grandpa Sy touch them in a way that made him uncomfortable. He further noted that he and E.G. previously stayed with the other side of their family "all the time," and they moved between relatives frequently. D.D. indicated that while they lived in the blue house (452 Killona Drive), E.G. told him once that Grandpa Sy touched her inappropriately. He said they were awake talking on the sofa around two in the morning, and he did not tell anyone about it because everyone was asleep.

A.D. testified that she is E.G. and A.M.'s mother. She stated that E.G. was born on April 27, 2009, and A.M. was born on November 14, 2011. She explained the children's living arrangements over the years and testified that defendant and her mother, T.B., moved from Maryland to St. Charles Parish in 2012 to help care for her children. She indicated that starting in February 2013 through May 2014, when E.G. was four to five years old, E.G. resided with T.B. and defendant at 460 Killona Drive, which was the white trailer next door to 452 Killona. E.G. then lived with A.D. for some time and then with E.G.'s father. E.G. then returned to live with T.B. and defendant from July 2015 to August 2016, where they resided in a beige trailer. After that, E.G. went to live with A.D. in Houston for second

grade, but from June 2017 through November 2017, E.G. again stayed with T.B and defendant, who then lived with E.B. at 452 Killona. After the allegations were raised against defendant in November 2017, E.G. then resided with her paternal grandmother, D.H.

A.D. also testified that starting in November 2012, when A.M. was approximately one-year-old, A.M. lived with T.B. and defendant. This continued for over three years until January 2016. A.D. explained that at first A.M. lived with them in the white trailer and they later moved into a beige trailer. A.D. stated that A.M. lived with her in Houston from January 2016 until the summer of 2017. A.M. then stayed again with T.B. and defendant in her grandmother's home from the summer of 2017 through November 2017, when the allegations were reported.

A.D. acknowledged that she lived in the white trailer from February 2013 to March of 2014 and that during that time, her children were occasionally left alone with defendant and her grandmother while she, her mom, and her cousin would go to the grocery store. A.D. stated that her cousin Ashley only lived in the white trailer from February 2013 until June 2013. She also stated that her mother and grandmother were not employed while the children lived with them and that defendant paid the bills. A.D. acknowledged that she and defendant had discussed him adopting A.M. She stated she did not see defendant behave inappropriately with E.G. or A.M. She testified that the girls would run to and hug him when he got home from work, and they would all play games together.

On December 4, 2017, Lieutenant Kinler with the St. Charles Parish Sheriff's Office conducted a forensic interview of E.G. and A.M. on December 4, 2017. Lieutenant Kinler testified that during E.G.'s interview, E.G. would not speak about why she was there, but agreed to write down what happened. Lieutenant Kinler read E.G.'s first written statement to the jury as follows:

'When it was Thanksgiving, I was at my Auntie [K.A.'s] house. When I got in the tub with [A.M.], Mariah asked my little sister did Sylvester ever touch my sister. She said yes. Then I asked her why do she always go with our grandpa-pa. She said because he would kill her. And then that night my brothers and' . . . 'Mariah told what happened. Then the next day we left to go to drop us off to go to school.'

After reviewing this statement, Lieutenant Kinler asked E.G. if she was trying to say that her sister was touched and E.G. responded affirmatively. Lieutenant Kinler then asked E.G. if she was touched and E.G. responded affirmatively. Lieutenant Kinler asked E.G if she would like to write about that and E.G. wrote the following second statement that Lieutenant Kinler read to the jury:

'When I was four, five, six, and seven, my grandpa-pa would always wake me up in the middle of the night when nobody was awake. He humped me on the sofa in the white trailer. Then we was in my Nana house, he did it again and I told him if he don't stop, I'll call the police and then he stopped.'

Lieutenant Kinler attempted to obtain further details from E.G. regarding her second statement, but E.G would not respond further either verbally or in writing.

In the video of her forensic interview with A.M., Lieutenant Kinler asked A.M. about defendant. A.M. told Lieutenant Kinler that she no longer sees Grandpa Sy and did not want to talk about him. Lieutenant Kinler then asked A.M. if she would like to respond by drawing. A.M. responded affirmatively and made three drawings during her interview. Lieutenant Kinler explained that in her first drawing, A.M. identified a figure on a bed as herself saying "no," identified another figure next to the bed as Grandpa Sy, and another figure as "a broken heart and herself." She stated the second picture contained her sister, E.G., with braids, a tooth and Grandpa Sy. She stated that A.M. also wrote "yes," "no," and "on" on the page. Finally, Lieutenant Kinler described that in the last drawing, A.M. identified her grandmother, herself, and a heart.

E.G. and A.M. both briefly testified at trial, but were not questioned about their reports of abuse by defendant. Rather, they viewed their forensic interviews conducted by Lieutenant Kinler with the jury. They both confirmed that they were not told what to say during the interviews and that they told the truth.

Marcey Willette is employed by Child Advocacy Services where she provides counseling to children and families. She testified that she met with E.G. five times and discussed a March 12, 2018 trauma assessment questionnaire completed by E.G. On the questionnaire, E.G. circled a response indicating she was a victim of "sexual abuse, sexual assault, or rape." When asked what age it happened the first time, E.G. circled the option stating "zero through six," and the option of "seven through twelve" for when it happened for the last time. When asked how many times this happened, E.G. circled "two to five times." E.G. also circled a response indicating she had witnessed "another person being beaten, raped, threatened with serious harm, shot at, or seriously wounded, or killed." Ms. Willette identified her handwritten notation under this question that stated "sister told sexual abuse." Finally, Ms. Willette stated that E.G. reflected on the questionnaire that "sexual abuse, sexual assault, or rape" caused her the most distress.

Pediatric forensic nurse practitioner Dr. Troy testified that she is a health care provider at Children's Hospital and was accepted as an expert in child maltreatment, sexual abuse, and delayed disclosure. Dr. Troy stated that she conducted a forensic medical exam of E.G. on December 30, 2017. Dr. Troy testified that a portion of her examination of E.G. was audio recorded and that portion was played for the jury. In the audio-recorded portion of Dr. Troy's examination, Dr. Troy asked E.G. if anyone ever touched her "pee-pee part," and when E.G. did not immediately respond, Dr. Troy told her she could write it. E.G. then replied, "my grandpa." When Dr. Troy asked her what her grandpa's name

was, E.G. responded, "Sylvester." In response to Dr. Troy's questions, E.G. said it happened more than one time and that it happened in the white trailer. E.G. stated that it was at nighttime, when they were inside the house sleeping. Dr. Troy asked if anyone told E.G. to keep a secret. Dr. Troy indicated that E.G. shook her head indicating yes. Dr. Troy asked if Sylvester asked her to keep a secret and E.G. replied affirmatively. Dr. Troy also asked E.G. if Sylvester said what would happen if she did not keep the secret or if anyone said they would hurt her if she said anything. E.G. did not respond and Dr. Troy again asked E.G. if she wanted to write it. She indicated that E.G. was crying and did not reply for the remainder of the recording.

Dr. Troy testified that she then turned off the recording device in an effort to allow E.G. to feel more comfortable in explaining what happened to her. E.G. told her "it went in her front private; that her clothes were off; that she told her brother [D.D.]; and she was talking about her grandfather." Dr. Troy also testified that E.G. indicated she saw defendant's front private, and it "had gone in." She stated that E.G. told her it happened in the white trailer, and it occurred more than once. E.G. told her it felt bad and wrote down the word "in" and pointed to the body parts at issue on a diagram.

Dr. Troy then conducted a physical exam. She found that the external genitalia and hymen were normal, and indicated that both findings were as she anticipated. Dr. Troy testified that her diagnosis for E.G. was "child sexual abuse more than one time." Dr. Troy did not examine A.M. because her guardian did not bring her for the appointment.

Defendant testified that he was sixty years old at the time of trial. He explained that he moved from Louisiana to Maryland in November 2012 to help care for his wife's grandchildren.[5] Defendant stated he has nine children, seven of

---

[5] Defendant married the children's grandmother, T.B., on March 10, 2019, a few months prior to the trial.

whom are female, and thirty-five grandchildren. He testified that A.M. is his favorite, that he would "pick her" over his own daughters because he had her since she was a baby, and he tells his daughters A.M. is his daughter.

Defendant stated he would never do anything like the allegations made against him. He denied that he ever "humped" E.G. or behaved inappropriately with A.M. He also denied that he was ever alone with the children. Defendant testified that he had never been convicted of a sex crime, but was previously accused by K.A. in 2015. He stated that the two allegations by K.A. were the only allegations of inappropriate behavior between him and the children.

Defendant further testified that he worked for Cajun Company and that Hope Dumas was his supervisor. He explained that Ms. Dumas picked him up almost every day for work between 4:30 and 5:00 in the morning. He stated that his grandchildren would be sleeping when he left for work, and he denied ever taking any of his grandchildren from their beds before he left. Hope Dumas confirmed that she was defendant's supervisor for approximately four years and would pick defendant up for work from his home on Killona Drive between 5:00 and 5:10 a.m.

Defendant's daughter, Shenese Hayman, testified that she lives in Maryland and is a mental health social worker. Ms. Hayman testified that she lived with her father a large part of her life and her mother was in the military. She recalled that defendant and T.B. once brought A.M. to Maryland for roughly two weeks. She described A.M. as very loving and attached to defendant.

## LAW AND DISCUSSION

*Sufficiency of Evidence*

In his first assignment of error, defendant asserts that the evidence is insufficient to support his conviction on count two, attempted indecent behavior

with a juvenile, A.M.[6] Defendant argues that the State presented no physical or testimonial evidence to support the charge. He also asserts in assignments of error two and three that the trial court erred in denying the motions for new trial and for post-verdict judgment of acquittal on these same grounds.

Defendant argues that the abuse was allegedly first reported by A.M. and E.G. to Mariah, who then reported it to K.A., and neither were called to testify. Defendant states that A.M.'s trial testimony did not contain allegations against him, but merely identified herself in the video of the forensic interview and affirmed that she was not told what to say or draw. Defendant further avers that A.M. made no allegations against him in her interviews. He also argues that A.M.'s drawings produced during the forensic interview with Lieutenant Kinler were simplistic and ambiguous. Defendant asserts that none of the three drawings are sufficient to support a conclusion that he attempted to commit a lewd or lascivious act upon or in the presence of A.M.

In response, the State asks that in light of *Jackson v. Virginia*,[7] this Court recognize the following facts as proven at trial: A.M. could not answer Deputy Putman's questions at the scene because she was overwhelmed with emotions and Deputy Coley testified that she dropped her head and cried; D.D. testified that his two sisters and Mariah used the hand gesture to convey to him what defendant was doing to both of his sisters; E.G. stated that A.M. told her she spends so much time with defendant because if she does not, he would kill her; in Detective Laurent's interview with A.M., she was withdrawn, she shut down when asked questions, and cried; A.D. left A.M. alone with defendant, and A.M. permanently lived with him during the relevant periods; E.G.'s handwritten statement reveals A.M. was

---

[6] Defendant does not contest the sufficiency of the evidence with respect to his conviction on count one for indecent behavior with a juvenile, E.G.

[7] 443 U.S. 307, 319, 99 S.Ct. 2781, 61 L.Ed.2d 560 (1979).

abused by defendant; A.M.'s drawing depicts the bed upon which defendant abused her, the word "no," and a broken heart to reflect what he did to her; and E.G.'s trauma assessment questionnaire indicates A.M. was sexually abused.

The State notes that the jury heard testimony from both victims and watched them at trial. The jury also listened to the officers' audio recording and the victims' interviews by trained professionals. The State contends that other than defendant's self-serving denial, no evidence or testimony undermined the victims' testimony. The State also argues that defendant had opportunities to abuse A.M. as she lived with him most of her life. The State contends that A.M. trusted defendant and he threatened her life, thus causing the fear that prevented her from speaking to professionals.

The constitutional standard for sufficiency of the evidence is whether, upon viewing the evidence in a light most favorable to the prosecution, any rational trier of fact could find that the State proved all of the essential elements of the crime beyond a reasonable doubt. *Jackson v. Virginia*, 443 U.S. 307, 99 S.Ct. 2781, 61 L.Ed.2d 560 (1979). This directive that the evidence be viewed in the light most favorable to the prosecution requires the reviewing court to defer to the actual trier of fact's rational credibility calls, evidence weighing, and inference drawing. *State v. Clifton*, 17-538 (La. App. 5 Cir. 5/23/18), 248 So.3d 691, 702. This deference to the fact-finder does not permit a reviewing court to decide whether it believes a witness or whether the conviction is contrary to the weight of the evidence. *State v. Caffrey*, 08-717 (La. App. 5 Cir. 5/12/09), 15 So.3d 198, 202, *writ denied*, 09-1305 (La. 2/5/10), 27 So.3d 297. In the absence of internal contradiction or irreconcilable conflicts with physical evidence, the testimony of one witness, if believed by the trier of fact, is sufficient to support a conviction. *Clifton*, 248 So.3d at 703.

La. R.S. 14:81 defines indecent behavior with a juvenile, in pertinent part, as follows:

A. Indecent behavior with juveniles is the commission of any of the following acts with the intention of arousing or gratifying the sexual desires of either person:

(1) Any lewd or lascivious act upon the person or in the presence of any child under the age of seventeen, where there is an age difference of greater than two years between the two persons. Lack of knowledge of the child's age shall not be a defense;

A lewd or lascivious act is one which tends to excite lust and to deprave the morals with respect to sexual relations and which is obscene, indecent, and related to sexual impurity or incontinence carried on in a wanton manner. *State v. J.M.*, 14-579 (La. App. 5 Cir. 2/11/15), 189 So.3d 1079, 1087. This encompasses not only the physical touching of the victim in an indecent manner, but also indecent sexual displays in the presence of children under the age of seventeen. *State v. Lestrick*, 13-289 (La. App. 5 Cir. 10/9/13), 128 So.3d 421, 429, *writ denied*, 13-2643 (La. 4/25/14), 138 So.3d 643.

On count two, defendant was found guilty of attempted indecent behavior with a juvenile. Attempt is defined in La. R.S. 14:27(A) as:

Any person who, having a specific intent to commit a crime, does or omits an act for the purpose of and tending directly toward the accomplishing of his object is guilty of an attempt to commit the offense intended; and it shall be immaterial whether, under the circumstances, he would have actually accomplished his purpose.

As noted above, defendant contends the evidence is insufficient because A.M. did not provide testimony at trial to support the charge, her extrajudicial statements are inadequate, and her drawings are ambiguous and insufficient. He contends that no other physical or testimonial evidence exists to support the charge. However, upon review of the record, we find that defendant ignores the evidence from sources other than A.M. The allegations against defendant came to light on Thanksgiving Day of 2017, when D.D. told his great aunt, K.A., that his

sisters disclosed to Mariah that defendant was sexually abusing them. D.D. further explained that his sisters used hand gestures to communicate what defendant did to them. During her interview with Lieutenant Kinler, E.G. wrote that A.M. told her and Mariah in the bathtub that defendant touched her and that she spent time with defendant because he would kill her if she did not. Further, Ms. Willette testified that E.G. indicated to her that A.M. disclosed sexual abuse to her. E.G. testified that she was never told by anyone what to say or write.

In her drawing made during her interview with Lieutenant Kinler, A.M. identified herself on a bed saying "no" and also identified defendant next to her on the bed. She drew another figure that she identified as a broken heart. The jury was able to view A.M.'s demeanor at trial and in recorded interviews by trained professionals. Additionally, Deputy Putman, Deputy Coley, Lieutenant Kinler, and Detective Laurent all testified that A.M. became upset and withdrawn when asked about the allegations involving defendant. At the hearing on defendant's post-trial motions and at sentencing, the trial court also commented that it found the children to be credible based on their demeanor at trial.

Considering the law and the evidence admitted at trial, a rational trier of fact, viewing the evidence in a light most favorable to the prosecution, could have found beyond a reasonable doubt that the evidence was sufficient under the standard set forth in *Jackson* to support defendant's conviction of indecent behavior with the juvenile, A.M. Because the evidence introduced at trial was sufficient to support a conviction for the charged offense, it also supports the jury's verdict on the lesser and included offense of attempted indecent behavior with a juvenile. *See State v. Harris*, 02-1589 (La. 5/20/03), 846 So.2d 709, 715. Where the defendant acquiesces in the submission of responsive verdics, he is bound by the trier of fact's decision to employ a responsive verdict. *Id.* Accordingly, the trial court also

did not err in denying defendant's motions for new trial or for post-verdict judgment of acquittal.

*Excessive Sentences*

In his fourth assignment of error, defendant asserts that the trial court imposed excessive sentences and failed to give adequate consideration to the factors in La. C.Cr.P. art 894.1 when tailoring his sentences. In his final assignment of error, defendant contends that the trial court erred in denying his motion to reconsider sentence.

Defendant's sentences fall within the statutory penalty ranges under La. R.S. 14:81 (indecent behavior with a juvenile) and La. R.S. 14:27/14:81 (attempted indecent behavior with a juvenile). As explained above, the trial court sentenced defendant to consecutive sentences of twenty years of imprisonment at hard labor, with two years to be served without the benefit of parole, probation, or suspension of sentence, as to count one, and ten years of imprisonment at hard labor, with one year to be served without benefit of parole, probation, or suspension of sentence as to count two. In his motion to reconsider sentence, defendant requested that the trial court strike his original sentences and re-sentence him to a term of imprisonment not to exceed 15 years. The trial court denied this request.

Defendant argues that he is sixty years old and that the consecutive sentences are effectively a life sentence for him. Defendant avers that in sentencing him, the trial court did not cite his personal background and neglected to consider his lack of criminal history other than a relatively minor felony conviction from 1997. He asserts that the court did not consider that he has dependent family members or the "utter lack of corroboration for these vague allegations made by the alleged victims."

In response, the State argues that the trial court addressed the factors in La. C.Cr.P. art. 894.1, including the need for correctional treatment or custodial

environment; that a lesser sentence would depreciate the seriousness of the offenses; that defendant knew or should have known that both victims were particularly vulnerable or incapable of resisting due to their age; that he used his position or status in committing both offenses; that he knowingly created a risk of great bodily harm to both victims; that the crimes resulted in significant permanent injury to both victims; and the crimes involved multiple victims, multiple times.

The State notes that during the hearing on defendant's motion to reconsider sentence, the trial court explained that defendant could have been charged with rape, a more serious crime requiring a life sentence. The State argues that defendant is the victims' step-grandfather and exploited this position of "immense trust and authority." The State contends that a consecutive sentence is justified here because the offenses were not committed at the same time as part of the same act or transaction. Furthermore, the presentence investigation report, requested by the trial court prior to sentencing, recommended that the trial court impose the maximum sentence for each count consecutively.

A trial court should give weight to La. C.Cr.P. art. 894.1(B)'s guidelines when sentencing and must state for the record the considerations taken into account and the factual basis for the sentence imposed. La. C.Cr.P. art. 894.1(B) and (C). The judge is not required to list every aggravating or mitigating factor as long as the record shows ample considerations of the guidelines. *State v. Clark*, 19-518 (La. App. 5 Cir. 6/24/20), 296 So.3d 1281, 1291, fn. 14, *writ denied*, 21-62 (La. 3/9/21), 2021 WL 870378.

The Eighth Amendment to the U.S. Constitution and Article I, § 20 of the Louisiana Constitution prohibit the imposition of excessive punishment. *State v. Calloway*, 19-335 (La. App. 5 Cir. 12/30/19), 286 So.3d 1275, 1279, *writ denied*, 20-266 (La. 7/24/20), 299 So.3d 69. A sentence is considered excessive, even if it is within the statutory limits, if it is grossly disproportionate to the severity of the

offense or imposes needless and purposeless pain and suffering. *State v. Woods*, 18-413 (La. App. 5 Cir. 12/19/18), 262 So.3d 455, 460. According to La. C.Cr.P. art. 881.4(D), the appellate court shall not set aside a sentence for excessiveness if the record supports the sentence imposed. In reviewing a sentence for excessiveness, the reviewing court shall consider the crime and the punishment in light of the harm to society and gauge whether the penalty is so disproportionate as to shock the court's sense of justice, while recognizing the trial court's wide discretion. *Calloway*, *supra*.

The relevant question on appeal is whether the trial court abused its broad sentencing discretion, not whether another sentence might have been more appropriate. *State v. Dixon*, 19-7 (La. App. 5 Cir. 12/30/19), 289 So.3d 170, 174, *writ denied*, 20-143 (La. 7/17/20), 298 So.3d 176. In reviewing a trial court's sentencing discretion, three factors are considered: 1) the nature of the crime; 2) the nature and background of the offender; and 3) the sentence imposed for similar crimes by the same court and other courts. *State v. Allen*, 03-1205 (La. App. 5 Cir. 2/23/04), 868 So.2d 877, 880. However, there is no requirement that specific matters be given any particular weight at sentencing. *Woods*, 262 So.3d at 460-61.

Generally, maximum sentences are reserved for cases involving the most serious violations of the offense charged and the worst type of offender. *State v. Melgar*, 19-540 (La. App. 5 Cir. 4/30/20), 296 So.3d 1107, 1115. However, jurisprudence provides that maximum or nearly maximum terms of imprisonment may not be excessive when the defendant has exploited a position of trust to commit sexual battery or indecent behavior with a juvenile. *State v. Howard*, 18-159 (La. App. 5 Cir. 11/7/18), 259 So.3d 583, 592, *writ denied*, 18-2034 (La. 4/29/19), 268 So.3d 1031; *State v. Badeaux*, 01-406 (La. App. 5 Cir. 9/25/01), 798 So.2d 234, 239, *writ denied*, 01-2965 (La. 10/14/02), 827 So.2d 414.

La. R.S. 14:81(H)(2) provides that whoever commits the crime of indecent behavior with a juvenile under the age of thirteen when the offender is seventeen years of age or older, shall be punished by imprisonment at hard labor for not less than two nor more than twenty-five years, and at least two years of the sentence shall be served without benefit of parole, probation, or suspension of sentence. La. R.S. 14:27(D)(3) provides that for an attempted offense, the offender shall be imprisoned for a period of time not to exceed one-half of the longest term of imprisonment prescribed for the offense attempted. Therefore, the sentencing range for attempted indecent behavior with a juvenile is zero to twelve and a half years of imprisonment at hard labor, with at least two years of the sentence served without benefit of parole, probation, or suspension of sentence.

In *Howard*, *supra*, the defendant was convicted of indecent behavior with a juvenile under the age of thirteen (count one) and sexual battery of a juvenile under the age of thirteen (count two). Just as in the instant matter, the defendant was sentenced to twenty years at hard labor, without the benefit of parole, probation, or suspension of sentence. This Court noted that the record showed defendant used his adult frame to pin down and trap the eleven-year-old victim while he groped her and attempted to insert an object into her underwear. The defendant on appeal argued, among other things, that this sentence was excessive as he did not use a weapon, he had no record of violence, and little criminal history. In evaluating the sentences, this Court stated that the fact that the defendant could accomplish his crimes without the use of weapons did not void the fact that his ability to overpower his victims was made possible through his superior height, weight, and strength. Further, this Court noted that the defendant had a pending charge of sexual battery/forcible rape of his niece, which allegedly occurred while he was out on bail. This Court stated that the defendant also had a position as a trusted

authority figure in the home, which he exploited to commit his crimes. As such, this Court concluded that the sentence was not excessive. *Id.* at 591.

In *State v. Craft*, 49,730, 49,731 (La. App. 2 Cir. 2/26/15), 162 So.3d 539, *writ denied*, 15-544 (La. 1/25/16), 184 So.3d 1288, the second circuit held that after the defendant pleaded guilty without a sentencing cap, the trial court properly imposed consecutive sentences of twenty years at hard labor, with ten years of each sentence to be served without benefits, for indecent behavior with juveniles. The court found that the sentences were not grossly disproportionate to the severity of the offenses and that the trial court adequately considered the defendant's prior convictions, his knowledge of the victims' vulnerability due to their youth, his use of his status as their grandfather to facilitate the commission of the crimes, and his threat to kill the victims and their families if they ever told anyone. The court noted that the defendant's step-daughter also accused him of sexually abusing her and her sister as children, and his criminal history included a sexual assault and child abuse conviction.

In *State v. Riley*, 15-142 (La. App. 1 Cir. 9/21/15), 2015 WL 5547489, *writ denied*, 15-1940 (La. 11/15/16), 209 So.3d 788, the defendant challenged his twenty-year sentence for indecent behavior with a juvenile under thirteen and his sentence for sexual battery of a victim under the age of thirteen as excessive. He contended that because of his advanced age and fragile health, the sentences exceeded his life expectancy and were unconstitutionally excessive. The trial court, in applying Article 894.1, noted that there was an undue risk that the defendant would commit another crime during any period of a suspended sentence or probation, that the statutory scheme does not provide for suspension of sentence, that the defendant was in need of correctional treatment or a custodial environment that could be most effectively met by his commitment to an institution, and that a lesser sentence would deprecate the seriousness of the crime. Furthermore, the

trial court noted that the victim was in an especially vulnerable position because of his age and socioeconomic status and that the defendant chose to prey on him because of those factors. Finally, the trial court noted that the defendant had a prior conviction for a very similar offense, highlighting his propensity to target boys for his own sexual gain.

In *State v. Collins*, 52,885 (La. App. 2 Cir. 9/25/19), 280 So.3d 891, the defendant challenged his sentence of twenty-five years' imprisonment without benefits for indecent behavior with a juvenile under thirteen years old. In upholding his sentence, the court indicated that the defendant abused the trust afforded to him as a dependable neighbor on multiple occasions and stated that the victims will carry their emotional scars for life.

Though defendant does not have a prior conviction for sexual abuse, the evidence established that defendant committed multiple acts of sexual abuse against his step-granddaughters over several years. E.G. reported to several different individuals that defendant sexually abused her from the ages of four to seven. During her interview with Dr. Troy, she explained that defendant inserted his "private part" in her and that it hurt. While not clear as to the time or frequency of abuse, A.M. also reported sexual abuse by defendant to her brother and sister. When asked to draw what happened to her, A.M. drew a picture of herself in a bed telling defendant "no." She also drew a picture with a broken heart.

A.M. spent the majority of her life with defendant. As to both victims, defendant acted as a caregiver and took advantage of that position. Both children were threatened by defendant and were afraid to explain what he did to them as they repeatedly became upset when asked about the abuse. A.M. told her sister that she spent time with defendant because he threatened to kill her if she did not.

As the trial court noted, based on E.G.'s claim that defendant penetrated her private part, the State could have charged defendant with the much more serious crime of rape, which requires a mandatory life sentence. Instead, defendant was charged with and convicted of indecent behavior with a juvenile and attempted indecent behavior with a juvenile, both of whom were well under the age of thirteen at the times the crimes were committed. Further, despite repeated instances of abuse reported by E.G., defendant was only charged with and convicted of one count.

As explained above, other courts have imposed maximum or near maximum sentences under similar circumstances. Furthermore, such sentences are not excessive in sex abuse cases involving the violation of position of trust with a child. Accordingly, we do not find that defendant's sentences are excessive and the trial court did not err in denying defendant's motion to reconsider sentence.

## ERROR PATENT

The record was reviewed for errors patent, according to La. C.Cr.P. art. 920; *State v. Oliveaux*, 312 So.2d 337 (La. 1975); and *State v. Weiland*, 556 So.2d 175 (La. App. 5 Cir. 1990).

The sentence imposed as to count two is illegally lenient with respect to the restriction of benefits as the trial court was required to restrict benefits for at least two years as to count two. The trial court sentenced defendant to ten years at hard labor with one year to be served without the benefit of parole, probation, or suspension of sentence. La. R.S. 14:27(D)(3) states, "In all other cases he shall be fined or imprisoned or both, *in the same manner* as for the offense attempted; such fine or imprisonment shall not exceed one-half of the largest fine, or one-half of the longest term of imprisonment prescribed for the offense so attempted, or both." [Emphasis added.] As such, the restriction of benefits imposed was one year less than the statutorily mandated minimum required by La. R.S. 14:81(H)(2); *State v.*

*Moore*, 16-644 (La. App. 5 Cir. 3/15/17), 215 So.3d 951, 969. Accordingly, we remand the matter for resentencing as to count two as the trial court imposed an illegal sentence regarding the restriction of benefits.

We also remand the matter for correction of the uniform commitment order (UCO). The UCO reflects that the disposition date and sentencing date both occurred on October 1, 2019. However, the transcript reflects that the sentencing date was October 1, 2020, and the disposition date, or date of conviction, was June 27, 2019. The Clerk of Court for the 29th Judicial District Court shall transmit the corrected UCO to the appropriate authorities in accordance with La. C.Cr.P. art. 892(B)(2) and to the Department of Corrections' legal department. *See State v. Bartholomew*, 18-670 (La. App. 5 Cir. 10/23/19), 282 So.3d 374, 388-89.

## DECREE

For the foregoing reasons, we affirm defendant's conviction on count two, as well his sentence as to count one. We remand the matter to the trial court for resentencing on count two and for correction of the UCO in accordance with this Court's instructions provided herein.

**CONVICTION AFFIRMED; SENTENCE ON COUNT ONE AFFIRMED; REMANDED FOR RESENTENCING ON COUNT TWO AND FOR CORRECTION OF UCO**

SUSAN M. CHEHARDY
CHIEF JUDGE

FREDERICKA H. WICKER
JUDE G. GRAVOIS
MARC E. JOHNSON
ROBERT A. CHAISSON
STEPHEN J. WINDHORST
HANS J. LILJEBERG
JOHN J. MOLAISON, JR.

JUDGES

CURTIS B. PURSELL
CLERK OF COURT

NANCY F. VEGA
CHIEF DEPUTY CLERK

SUSAN BUCHHOLZ
FIRST DEPUTY CLERK

MELISSA C. LEDET
DIRECTOR OF CENTRAL STAFF

(504) 376-1400
(504) 376-1498 FAX



FIFTH CIRCUIT

101 DERBIGNY STREET (70053)

POST OFFICE BOX 489

GRETNA, LOUISIANA 70054

www.fifthcircuit.org

## NOTICE OF JUDGMENT AND CERTIFICATE OF DELIVERY

I CERTIFY THAT A COPY OF THE OPINION IN THE BELOW-NUMBERED MATTER HAS BEEN DELIVERED
IN ACCORDANCE WITH **UNIFORM RULES - COURT OF APPEAL, RULE 2-16.4 AND 2-16.5** THIS DAY
**APRIL 28, 2021** TO THE TRIAL JUDGE, CLERK OF COURT, COUNSEL OF RECORD AND ALL PARTIES NOT
REPRESENTED BY COUNSEL, AS LISTED BELOW:

**CURTIS B. PURSELL**
CLERK OF COURT

# 20-KA-323

## E-NOTIFIED

29TH JUDICIAL DISTRICT COURT (CLERK)
HONORABLE M. LAUREN LEMMON (DISTRICT JUDGE)
LOUIS G. AUTHEMENT (APPELLEE)          GWENDOLYN K. BROWN (APPELLANT)

## MAILED

HONORABLE EMILE R. ST. PIERRE          HON. JOEL T. CHAISSON, II (APPELLEE)
(DISTRICT JUDGE)                       DISTRICT ATTORNEY
DIVISION "C"                           TWENTY-NINTH JUDICIAL
29TH JUDICIAL DISTRICT COURT           DISTRICT COURT
P. O. BOX 424                          POST OFFICE BOX 680
HAHNVILLE, LA 70057                    HAHNVILLE, LA 70057